**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | | |
|---|---|---|
| **JAMES C. WETHERBE, PH.D.** | § | |
| | § | **CIVIL ACTION NUMBER** |
| **PLAINTIFF** | § | |
| | § | |
| **V.** | § | **5:12-cv-00218** |
| | § | |
| **TEXAS TECH UNIVERSITY** | § | |
| | § | |
| **DEFENDANT** | § | **JURY DEMANDED** |

<u>**PLAINTIFF'S COMPLAINT**</u>

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

1.      This is a First Amendment retaliation case.  The often-stated justification for tenure of faculty at institutions of higher education is academic freedom.  However, at least one empirical study has found that tenure increases the cost of tuition,[1] a matter of public concern for taxpayers who fund public institutions like Texas Tech University.  Texas Tech University has engaged in a campaign of innuendo and character assassination to deprive Plaintiff of due process and retaliate against him because of his openly-held views on tenure.  Provost and Senior Executive Vice President Bob Smith even stated in Plaintiff's grievance hearing that tenure "is not anything that we want to lose, particularly in the political times we are in now."

<u>PARTIES</u>

2.      **PLAINTIFF JAMES C. WETHERBE, PH.D. ("Plaintiff" or "Dr. Wetherbe")** is an individual who currently resides in Lubbock County, Texas.

---

[1]James Hammerton, Texas's Higher Education Battle: The Fight to Make the Public University System Work for Students, Freedom Works Foundation Issue Analysis (July 2011).

3.     **DEFENDANT TEXAS TECH UNIVERSITY ("Defendant" or "Texas Tech" or "TTU")** is a public institution created by the State of Texas under the direction, management, and control of the Texas Tech University Board of Regents.  As such, it may be served with process either on Interim President Dr. Lawrence Schovanec, Office of the President, Texas Tech University, 150 Administration Building, Box 42005, Lubbock, TX 79409-2005, and/or Kent R. Hance, Office of the Chancellor, Texas Tech University, 124 Administration Building Mailstop 42013, Lubbock, TX 79409.  The Chancellor is the Chief Executive Officer of the Texas Tech University System.

<u>JURISDICTION AND VENUE</u>

4.     Pursuant to 28 U.S.C. § § 1331 and 1343, the Court has federal question jurisdiction over this action which arises under the Fourteenth Amendment of the United States Constitution and the Reconstruction Era Civil Rights Act codified at 42 U.S.C. § § 1983 and 1985 (3).

5.     Venue is proper in the U.S. District Court for the Northern District of Texas, Lubbock Division pursuant to 42 U.S.C. 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred therein.

6.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims which are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

<u>EXHAUSTION OF ADMINISTRATIVE PROCEDURES</u>

7.     By letter dated August 9, 2012, to John T. Huffaker, General Counsel, Texas Tech University System, Plaintiff provided notice of his claims and copies of the "Horn Grievance"

and the "Dean Grievance," which are identified in more detail below.  A true and correct copy of the August 9, 2012, grievance letter (without attachments), is attached hereto as Exhibit A.

8.      By letter dated August 22, 2012, to Plaintiff's counsel, Mr. Huffaker responded that "there was no further action to be taken within the University's procedural policies" relating to the "Horn Grievance" and that "[Operating Policy] 70.28 is not an administrative prerequisite which must be exhausted prior to any further action Dr. Wetherbe intends to pursue" relating to the "Dean Grievance."   A true and correct copy of the August 22, 2012, response to the grievance letter is attached hereto as Exhibit B.

9.      Defendant should be estopped from asserting that Plaintiff failed to exhaust his administrative remedies because Plaintiff tried in good faith to provide actual notice of his claims with an opportunity to resolve them prior to suit.

CONDITIONS PRECEDENT

10.     All conditions precedent have been performed or have occurred.

FACTS

**Dr. Wetherbe's Credentials**

11.     Since 2000, Dr. Wetherbe has held the Robert G. Stevenson Chaired Professor in Information Technology and has held administrative positions including Founding Director of the Institute for Internet Buyer Behavior (funded by a $500,000 grant he obtained from Best Buy), Associate Dean for Research and Development, Director of the externally-funded Chief Executive Roundtable, an Associate Dean of Outreach, and Faculty Advisor for the Rawls Graduate Association of the Rawls College of Business at Texas Tech University ("Rawls College of Business").

12.     Dr. Wetherbe is an alumnus who returned to Texas Tech in 2000 after 27 years of serving on the faculty of the University of Houston, University of Minnesota, and University of Memphis as well as serving in a variety of managerial positions in industry including NCR, Houston Oil and Minerals (acquired by Tenneco) and CSC Index Group.  He obtained his M.B.A. in Management Information Systems from Texas Tech in 1973.  Dr. Wetherbe obtained his Ph.D. in Management Information Systems, Organizational Behavior and Computer Science Management from Texas Tech in 1976.

13.     Dr. Wetherbe received the Distinguished Alumnus award from TTU's Rawls College of Business in 2006.

14.     Dr. Wetherbe has given hundreds of keynote addresses and speeches worldwide for corporations, professional organizations and universities (wetherbe.ba.ttu.edu). He was rated as one of the top 20 lecturers and consultants in Management Information Systems (MIS) by *Information Week* and recently was ranked as one of the 20 most influential scholars in the field in research conducted at Georgia State University.  He is co-recipient of the first *MIS Quarterly* Distinguished Scholar Award.  He has authored and co-authored 32 books, including multiple editions, is widely published in top journals with over 6500 citations, and generates 50 pages of Google hits. During his career he has raised over $12 million in funding for research.  Dr. Wetherbe also regularly consults for private companies and has served on the board of directors for several major corporations, including Best Buy, CIBER, Sandia Motorsport Park, Bizideo, Ilostmyjob.com, Starthaus, and Dayport.  Entrepreneurial efforts include Co-founder of Mead Publishing and the Wetherbe Group which created the software MOTIVATOR®.

15.     At Texas Tech, Dr. Wetherbe's teacher evaluations consistently place him as the number one or number two highest-rated professor among the faculty who teach in the Rawls College of Business Executive and Professional MBA Programs.

16.     A true and correct copy of Dr. Wetherbe's CV is attached as Exhibit C.

**Dr. Wetherbe's Views on Tenure**

17.     Dr. Wetherbe's views on tenure are well-known within the TTU community and to other academics around the nation and the business leaders he has consulted for and spoken to during the last approximately 20 years.

18.     Dr. Wetherbe resigned tenure nearly 20 years ago at the University of Minnesota, declined it at the University of Memphis as the FedEx Chaired Professor of Excellence, and declined it again when he joined TTU as the Robert Stevenson Chaired Professor of MIS.  This was a personal, professional and principled decision.  Dr. Wetherbe believes in leading by example.  While he has rejected tenure himself, he engages in current tenure practices by providing external review letters and voting positively on qualified tenure cases.

19.     Tenure is commonly not viewed well by business leaders and taxpayers as they feel it leaves little remedy for subpar teaching often experienced by them and/or their children. They resent that underperforming faculty (the few that make the majority look bad) have unwarranted job security at a time when the rising cost of a college education is problematic. For these reasons, not having tenure provides greater credibility for Dr. Wetherbe in the business world.

20.     In Dr. Wetherbe's view, tenure is more about job security than academic freedom. Dr. Wetherbe resigned tenure in an effort to set an example that academia would have more credibility if tenure was voluntarily forfeited by faculty from within universities rather than

having it eventually eliminated from outside by what has become increasing external pressure from taxpayers, legislatures and donors.  He had hoped to spend the last 25-30 years of his career as a professor without tenure and then document in academic literature the viability and advantages of serving without tenure for productive faculty.  In so doing he hoped to influence faculty to replace current tenure practice of guaranteed "life time" employment with revolving multi-year terms.

**Tenure Is a Matter of Public Concern**

21.     Tenure is a matter of public concern as reflected by the following examples of recent media coverage:

a.     On August 24, 2012, the *Wall Street Journal* presented opposite viewpoints on the issue of whether tenure for college professors should be abolished.

b.     The cover story of *Texas Monthly* for October 2012, is entitled "Storming the Ivory Tower" and recounts recent battles at the University of Texas and Texas A&M University over college reform, including changes in tenure.

**Dr. Wetherbe's Employment at Texas Tech**

22.     Dean of the College of Business Administration Roy Howell made the initial offer for Dr. Wetherbe to join the Texas Tech faculty as the Robert G. Stevenson Chair in Information Technology on February 14, 2000.  A true and correct copy of the offer letter is attached as Exhibit D.  The letter provides that the Stevenson Chair appointment is for three years and is renewable subject to the agreement establishing the Chair.  The letter also provides that either party can change the terms of appointment on mutual agreement with one year notice to be effective at the beginning of the Fall Semester following the one year notice.  The letter states in part, "We also understand that you reject tenure."

23.     Provost John M. Burns made the formal offer by letter dated June 15, 2000.  A true and correct copy of the offer letter is attached as Exhibit E.

24.     Among the qualifications for the recipient of the Stevenson Chair is "a strong national reputation as a leader in the area of Information Technology" and preference for a graduate of Texas Tech University.  A true and correct copy of the Agreement Establishing the Robert G. Stevenson Chair in Information Technology is attached as Exhibit F.  There is no requirement that the recipient of the Chair be a tenured professor.

25.     Each year, TTU has provided Dr. Wetherbe with personnel action forms and/or budget documents showing his job title as Professor.  True and correct copies of these documents are attached as Exhibit G.

26.     Dr. Wetherbe has a philosophical commitment to education as a public good that should benefit students and society at large.  Besides donating funds from his speaker honorariums and book royalties, and in lieu of receiving income or covering research expenses, Dr. Wetherbe has donated most of the earnings from his Chair endowment to establish scholarships, two endowed professorships and support the Rawls College of Business building fund.  These contributions are in excess of $1.2 million.  A true and correct copy of the Compensation Donation Agreement is attached as Exhibit H.

**The Horn Professor Nomination**

27.     The Board of Regents established a special professorship known as the "Paul Whitfield Horn Professorship," named in honor of Paul Whitfield Horn, the first president of the institution.  The Horn Professorship is the highest honor that the university may bestow on members of its faculty and is granted in recognition of a faculty member's attainment of national and/or international distinction for outstanding research or other creative, scholarly achievement.

A true and correct copy of TTU Operating Procedure (OP) 32.09, Selection of Paul Whitfield Horn Professorships, is attached hereto as Exhibit I.

28.      There are fewer than 40 current Horn Professors on the faculty of over 1,000.

29.      During the 2011-2012 school year, Dr. Wetherbe received a nomination for a Paul Whitfield Horn Professorship ("Horn Professorship").

30.      Dr. Wetherbe's nomination was initiated by Dr. W.J. Conover, who is himself a Horn Professor.  A true and correct copy of Dr. Conover's nomination letter is attached hereto as Exhibit J.  The nomination was recommended by a college committee of all three Rawls College Horn Professors, including Dr. Conover.

31.      Dr. Wetherbe was nominated by Dr. Allen T. McInnes, Dean of the Rawls College of Business.  A true and correct copy of the Dean's nomination letter is attached hereto as Exhibit K.

32.      Dr. Wetherbe's nomination was approved by the Horn Committee by a vote of 5-2 and by the Provost of the University.   A true and correct copy of the Horn Professor Nomination Ballot is attached as Exhibit L.

33.      Dr. Wetherbe's nomination was placed on the draft agenda for the March 2012 meeting of the University Board of Regents. The agenda was drafted at some point prior to February 1, 2012.  However, the agenda item was withdrawn at the request of the Office of the President.

34.      On March 8, 2012, Pam Roberson, Executive Administrative Associate in the Office of the Provost and Senior Vice President sent an email to the Horn Committee stating in part, "The Provost has requested a follow up meeting with the committee.  New information has

come to light regarding one of the candidates." A true and correct copy of the email is attached as Exhibit M.

35.     The "new information" Provost Smith learned was the fact that Dr. Wetherbe does not have tenure. As further alleged below, Provost Smith learned this information as a result of Dr. Wetherbe's nomination to be Dean of the Rawls College of Business.

36.     Provost Smith reconvened the Horn Committee, told the members that Dr. Wetherbe does not have tenure with the hopes that the Horn Committee would choose to vote again to not approve Dr. Wetherbe's nomination. However, the Horn Committee chose not to change their vote.

37.     On March 27, 2012, Provost Smith changed his vote on Dr. Wetherbe's nomination. TTU President Guy Bailey concurred with Provost Smith. A true and correct copy of the revised Horn Professor Nomination Ballot is attached as Exhibit N.

38.     In a meeting with Dean Allen McInnes during March 27-30, 2012, Dr. Wetherbe learned that Provost Smith had raised an issue regarding his eligibility for the Horn Professorship because Dr. Wetherbe did not have tenure.

39.     On April 2, 2012, Dr. Wetherbe requested a meeting with Provost Smith, who chose not to meet with him until April 20, 2012.

40.     In the meeting on April 20, 2012, which was also attended by Senior Vice Provost Rob Stewart, Provost Smith stated that in his opinion Dr. Wetherbe's twelve-year old contract was invalid. Provost Smith also stated the following:

a.  Dr. Wetherbe's appointment in 2000 as Professor, in which he was allowed to decline tenure was a mistake on the part of TTU and must be corrected.

b.   Although there are no OPs that state a non-tenured track or non-tenured professor is ineligible for a Horn Professorship, it is Provost Smith's interpretation that it is the intent, and therefore, Dr. Wetherbe was ineligible.

c.   Options for correcting the "mistake" include:

i.   Dr. Wetherbe could accept a tenure track position against his wishes and go up for tenure review in the next year in the same manner as an assistant professor.  Upon receiving tenure, he would be eligible for a Horn Professorship.  Subsequently, the Provost offered a review over the summer but stated this review would be "formidable," which seemed punitive because Dr. Wetherbe had been offered tenure as part of the review and hiring process in 2000 and had just completed an extensive review for the Horn Professorship.  The standards for Horn Professor are more demanding than those for tenure.  Dr. Wetherbe had just provided 20 high profile references for the Horn nomination.  To again be required to ask colleagues in his field to provide references for tenure at this stage in Dr. Wetherbe's career would be professionally embarrassing.

ii.   Dr. Wetherbe could accept a tenure track position against his wishes, but not go up for tenure, remain ineligible for a Horn Professorship, and retire within six years.

iii.   Dr. Wetherbe could not accept a tenure track and be stripped of his professorial rank and title and accept a demotion in rank and title.

iv.   Dr. Wetherbe could file a grievance;

v.   Dr. Wetherbe could litigate to maintain his professorial rank and eligibility for a Horn Professorship; or

vi.   Dr. Wetherbe could resign.

41.     OP 32.09 provides in part, "The President will forward his/her recommendations to the Board of Regents.  If the recommendation of the president varies from the majority vote of the [provost and senior vice president]'s advisory committee, the president will communicate her/his recommendation in writing to the Horn Professors.  The PSVP [Provost and Senior Vice President] shall notify each nominee and her/his college dean of the status of the nomination."

42.     OP 32.09 requires the Provost to notify each nominee and his college Dean of the status of his nomination.  By email dated May 29, 2012, to Provost Smith, Dr. Wetherbe inquired about the status of his nomination.  A true and correct copy of the email is attached as Exhibit O.

43.     Dr. Smith responded in part, "I am somewhat confused by your request, as I have clearly communicated this information to you previously.  However, let me reiterate that, in my opinion, you are not a viable candidate for Horn Professor due to the fact that you have chosen not to engage in the tenure process….Pursuant to OP 32.09, I will inform the Horn Professors in writing as to the reasons for my decision."  A true and correct copy of the email is attached as Exhibit P.

44.     In an email dated June 1, 2012, to the Horn Professors, Provost Smith represented Dr. Wetherbe's status as follows:  "Dr. Wetherbe was initially appointed as a part-time Professor in the College of Business Administration in 2000. He began serving in a full-time capacity in 2009. He was not, nor has he ever been either tenured or placed on tenure track at TTU.  This was at Dr. Wetherbe's specific request."

45.     The email was highly misleading and disparaging to Dr. Wetherbe's reputation, career, and contributions to TTU.

46.     Provost Smith ignored and failed to state the fact that Dr. Wetherbe had been awarded tenure previously at the University of Houston and University of Minnesota, and that he

had declined it at the University of Memphis and at TTU when he was hired with the approval of the Dean Howell, Provost Burns, and President Schmidly.

47.     There is a meaningful difference between having been promoted and awarded tenure (twice), resigning it, and continuing to decline it when offered (again twice) as opposed to never have been willing to engage in the process.

48.     Section 2.c. of OP 32.09 states in part, "The president will forward his/her recommendation to the Board of Regents.  If the recommendation of the president varies from the majority vote of the PSVP's advisory committee, the president will communicate his/her recommendation in writing to the Horn Professors."

49.     Contrary to OP 32.09, President Bailey failed to forward Dr. Wetherbe's Horn nomination to the Board of Regents.

50.     By email dated June 4, 2012, to Provost Smith, Dr. Wetherbe re-urged the Provost and President Bailey to forward his nomination in compliance with OP 32.09.  A true and correct copy of the email is attached as Exhibit Q.

51.     OP 32.09 does not state that Horn professors must be tenured professors.

**The Horn Grievance**

52.     On April 26, 2012, Dr. Wetherbe filed a grievance against Provost Bob Smith pursuant to Operating Procedure (OP) 32.05, Faculty Grievance Procedures, relating to his appointment as a Professor and nomination as a Horn Professor ("the Horn grievance").

53.     President Bailey entrusted the job of empanelling a grievance committee to Senior Vice Provost Rob Stewart, whose immediate supervisor is Provost Bob Smith.  Vice Provost Stewart indicated that a number of faculty members were unavailable, declined, or recused; however, he refused to identify them.

54.     Section 4.b. of OP 32.05 provides in part that the grievant and the administrator may question all witnesses.

55.     Dr. Wetherbe and Provost Smith presented their cases separately to the grievance committee, and were not allowed to hear each other's presentations.  Dr. Wetherbe offered to provide a certified court reporter, and the offer was rejected.  An audio recording was made of the proceeding.  A certified court reporter prepared a transcript from the audio recording, but there are some portions that are unintelligible.

56.     According to the transcript of the faculty grievance hearing on July 5, 2012, Provost Bob Smith stated that the "problem with Professor Wetherbe…emerged through some coincidental kinds of illuminations during this spring that I realized he was not a tenured – tenure track or tenured professor.  So he really didn't have the right to have the title of professor."

57.     According to OP 32.01, Promotion and Tenure Standards and Procedures, posted December 8, 2009, "[t]enure is designed to accomplish the following purposes:

a.     To assure the faculty of freedom of teaching, of research, of opinion, and of full participation as citizens in the community;

b.     To provide appropriate procedures of due process for establishing justification for possible termination of tenure, so that faculty members may be guaranteed adequate notice and a fair hearing;

c.     To assist the university by encouraging sound standards for the original selection of faculty; and

d.     To result in the retention, encouragement, and promotion of the ablest and most promising faculty."

58.     Section 5.b. of OP 32.01 provides in part, "In exceptional cases…professors…may have their initial appointment in the university with tenure when the traditional tenure review procedure set forth in section 5.e. preceded the appointment.

59.     OP 32.01, Promotion and Tenure Standards and Procedures, was adopted by the Board of Regents on May 18, 2012, but was not posted until July 11. 2012, after Dr. Wetherbe's grievance hearing on July 5, 2012.  A true and correct copy of the revised policy is attached as Exhibit R.  The revised OP 32.01 states in part, "This policy shall not be applied in derogation of any faculty member's contract rights as set forth in the faculty member's letter of appointment."

60.     Despite the obvious conflict of interest of the Vice Provost coordinating the grievance process and the procedural irregularities, on July 6, 2012, the Texas Tech Faculty Grievance Committee issued its unanimous Report to President Bailey recommending, in part, as follows:

> Professor Wetherbe's contract with Texas Tech which has been in effect for the last 12 years should continue to be honored.
>
> We recommend that the process continue by the forwarding of the Horn Committee's ballot sheet and recommendation letter to the President and that the President subsequently forward his recommendation to the Board of Regents.

61.     In a one-line letter to Dr. Wetherbe dated July 20, 2012, President Guy Bailey stated only: "I concur with the Provost's decision regarding your nomination for Horn Professor."  A true and correct copy of the letter is attached as Exhibit S.

62.     Section 4.d. of OP 32.05, Faculty Grievance Procedures states in part, "If the president's decision differs from that recommended by the Grievance Committee, the written reasons for such difference will be provided to the grievant and the committee."  However, no explanation was provided.  By rejecting the recommendation of the Grievance Committee, Dr. Bailey again ignored Section 2.c. of OP 32.09, which requires the president to forward his recommendation to the Board of Regents whether or not he agrees with the Horn nomination.

63.     By letter dated July 27, 2012, to Dr. Bailey, Dr. Wetherbe requested a written reason for the decision, clarification whether Dr. Bailey intended to present the Horn nomination to the Board of Regents at its meeting on August 9-10, 2012, and for a written statement regarding the status of his contract with Texas Tech University.  A true and correct copy of said letter is attached hereto as Exhibit T.

64.     On August 8, 2012, Provost Smith testified under oath:

> In my opinion, based on all my reading of the OPs, you cannot be a professor if you are untenured; therefore, you can't recommend somebody to be a Horn Professor, the most distinguished professor at the University, unless you are a tenured professor.

65.     When Provost Smith was asked if he believed Dr. Wetherbe's views on tenure made him unfit to be a Horn Professor, Provost Smith responded: "Yes."

66.     When asked if he thought Dr. Wetherbe's views on tenure made him unfit as a dean candidate as well, Provost Smith again responded: "Yes."

67.     OP 32.09 does not state that Horn professors must be tenured professors.

**The Dean Search**

68.     In August of 2011, Dr. Allen McInnes, Dean of the Rawls College of Business, announced plans to retire.

69.     The announcement for the position states in part, "The successful candidate will have a distinguished record of accomplishment, which merits appointment at the rank of professor and which ideally will include having an earned doctorate in a discipline appropriate to the college."

70.     The announcement does not require that the Dean be tenured.

71.     Dean McInnes does not have tenure.

72.     It is not unusual for deans of business schools to be untenured because business schools value the credentials and experience of business executives.  During Dr. Wetherbe's career, he has served under three untenured deans who were business executives: David Lilly and Peter Townley at the University of Minnesota, and Dr. Allen McInnes at Texas Tech.

73.     Provost Bob Smith convened a Dean's Search Committee, and Dr. Robert Lawless was hired as an outside search consultant.  Dr. Wetherbe was selected to serve on the Dean's Search Committee.  The Search Committee was composed of twenty members, including faculty, administrators, and alumni/business leaders.  Robert Stevenson, the donor who endowed Dr. Wetherbe's Chair, was a member of the Search Committee.

74.     Dr. Wetherbe received a number of nominations from faculty and business leaders to be Dean, so he resigned from the Search Committee on January 10, 2012, in order to be eligible.  Dr. Wetherbe was the only "internal candidate," meaning he was the only candidate currently employed by the Rawls College of Business.  Dr. Wetherbe became a formal candidate for the deanship on February 14, 2012.

75.     As part of his due diligence in considering the Dean candidacy, Dr. Wetherbe asked and was informed by Provost Smith in an email on February 29, 2012, that (according to Provost Smith's interpretation of OP 32.09.3.a), if appointed Dean before being appointed Horn Professor, Dr. Wetherbe would no longer be eligible to be a Horn Professor.  No mention was made of the fact that the lack of tenure would disqualify Dr. Wetherbe from being Dean.

76.     After an extensive search that included over 60 nominees from around the country, four finalists were recommended by the Search Committee to interview on campus with the Provost and President of Texas Tech University.

77.     Minutes from the Rawls College of Business Dean Search Organizational Meeting on November 18, 2011, show that Provost Smith charged the Search Committee with identifying five or six candidates for short off-campus interviews that he wished to sit in and observe.  Based on the off-campus interviews, the Search Committee was to provide two or three unranked finalists.  A true and correct copy of the minutes is attached as Exhibit U.

78.     The following question was included in the Candidate Interview Questions for the off-campus interviews:

> The Provost asked that we ask each candidate the following questions for his presentation to the board.  Are you currently tenured?  Please provide a summary of your tenure history.

79.     A true and correct copy of the interview questions is included at Exhibit V.

80.     The question was not included in two previous drafts of the interview questions, which are attached as Exhibit W.

81.     Dr. Wetherbe was asked about his tenure status during his off-campus interview, and he told the search committee that he had rejected tenure and why, consistent with his previous public expression of his views.

82.     Following off-campus interviews, the Search Committee recommended four candidates to Provost Smith for on-campus interviews.  The candidates were ranked according to the Hare system even though the Provost had instructed the Search Committee not to rank them.

83.     Dr. Wetherbe was included within the top four despite sharing his views on tenure with the Search Committee.

84.     Instead of following the Search Committee recommendation, the Provost decided to interview three candidates, instead of four, and eliminated Dr. Wetherbe as a candidate.

85.     A few weeks later, one of the top four candidates withdrew from the search.

86.     Although Dr. Wetherbe was recommended among the top four candidates, Dr. Wetherbe was not selected as a replacement for the candidate who withdrew.  Instead, Lance Nail, who was not even in the top four candidates, was interviewed and eventually selected as Dean of the Rawls College.

87.     Dr. Wetherbe was not told at the time that his view on tenure disqualified him from being Dean, according to the Provost.

88.     Provost Smith later testified under oath that he chose not to interview Dr. Wetherbe for three reasons:

> Because, first of all, I didn't think his off-campus interview went very well.  Secondly, he's a non-tenured faculty member of the university. And, thirdly, when I reviewed his materials, I did not agree with some of his philosophies on being a leader of a college.

89.     Dr. Wetherbe's off-campus interview must have gone well in the eyes of the Search Committee or he would not have been recommended as one of the top four candidates.  It is obvious that Provost Smith disagreed with Dr. Wetherbe's philosophy on tenure and excluded him from further consideration as Dean because of his views on tenure.

90.     Provost Smith testified that he could not remember when he first became aware of Dr. Wetherbe's views on tenure, but he became aware of these views during the dean search process.

91.     Provost Smith further testified that he thought Dr. Wetherbe's tenure views were in his application, and that the issue certainly came up in his off-campus interview which was either March 8-9, 2012.

92.     In fact, in a meeting on February 3, 2012, with Provost Smith and Vice Provost Stewart, Dr. Wetherbe discussed his overlapping roles at both the University of Minnesota and the University of Memphis during a seven year period between 1993 and 2000.  During this time,

Dr. Wetherbe directed the MIS Research Center at the University of Minnesota and the FedEx Center for Cycle Time Research and served as interim Dean at the University of Memphis. The fact that Dr. Wetherbe had declined tenure was stated and discussed during the meeting.

93.     Provost Smith also testified that he believes Dr. Wetherbe's views on tenure make him unfit to be a Horn Professor, and unfit to be a Dean candidate.

94.     Ironically, when asked to clarify his concerns in terms of Dr. Wetherbe's tenure status, Provost Smith acknowledged Dr. Wetherbe's right of free speech, which according to the Provost only applies to those who have tenure:

> Well, the issue is primarily whether someone is tenured or not. I could care less if Professor Wetherbe decided after he was tenured that, you know, tenure is not so important, and he might even try to make that case in the college. That would be his Constitutional right to do that. But I do object to somebody being a dean and not being tenured because, then, they are making recommendations for others for tenure and to me, that's wrong, it's unfair.

95.     Due to his resignation from the search committee in early January, the fact that Dr. Wetherbe was a potential candidate was common knowledge to the faculty and staff of the Rawls College of Business. In other words, to the faculty and staff of the Rawls College of Business, a reference to the "internal candidate" was synonymous with an explicit reference to Dr. Wetherbe.

96.     Robert Stevenson is founding CEO of CIBER, benefactor of Dr. Wetherbe's Chair, and a Distinguished Donor who was appointed to the Dean Search Committee by Provost Smith. On April 30, 2012, Mr. Stevenson sent a letter to Provost Smith questioning his conduct in the Dean Search, and particularly his elimination of Dr. Wetherbe as a candidate after Dr. Wetherbe had been selected by the Search Committee for on-campus interviews. A true and correct copy of the letter is included as Exhibit X.

97.     On May 17, 2012, Mr. Stevenson sent a second letter to Provost Smith because he did not feel that Provost Smith had adequately addressed his concerns.  Mr. Stevenson objected to Provost Smith's decision to eliminate Dr. Wetherbe, "a highly qualified candidate from a campus interview where he could share his vision for the Rawls College with the faculty and leadership of Texas Tech."  A true and correct copy of the letter is included as Exhibit Y.  Mr. Stevenson also indicated his intent to cancel an anticipated $9 million gift to Texas Tech. Provost Smith never responded to the second letter.

**The Provost's Email**

98.     On February 2, 2012, Provost Smith sent an email to the entire faculty and staff of the Rawls College of Business, and the twenty person Dean's Search Committee. The email's purpose was to quash an alleged rumor the Provost had learned of from an unnamed source.  A true and correct copy of the email is attached as Exhibit Z.

99.     The Provost alleged that a rumor had emerged from within the Rawls College of Business that a strong internal candidate had an "inside track" for the deanship, and thus that other candidates need not apply for the deanship. At that time, it was well known that Dr. Wetherbe was the only internal candidate for the deanship.  The email emphasized that no such inside track existed, and further emphasized that quashing the rumor was necessary to return the appearance of honesty and authenticity to the Dean's Search, which the rumor had diminished.

100.    The Provost's claimed sources for the "rumor" were later revealed to first be Dr. Debra Laverie and next, the consultant hired by the University to lead the search, Dr. Robert Lawless.  However, Dr. Lawless testified under oath that he did not discuss any "rumor" about any internal candidate having an inside track with the Provost, and that he had not heard of or

discussed any such rumor.  Under oath, Dr. Laverie has given conflicting evidence regarding whether such a rumor existed.

101.    Dr. Wetherbe filed suit against Dr. Laverie in Cause No. 2012-502,988; in the 99th District Court of Lubbock County, Texas.  Provost Bob Smith's deposition was taken on August 3, 2012. Dr. Wetherbe has alleged various causes of action against Dr. Laverie individually for slander and libel, based on her involvement in spreading the rumor, which was false, and based on her statements to third parties that Dr. Wetherbe has used an electronic device to listen to others' conversations and/or has engaged in wiretapping.

**The Dean Grievance**

102.    On June 14, 2012, Dr. Wetherbe filed a grievance against Provost Bob Smith alleging that he denied Dr. Wetherbe's due process rights and/or retaliated against Dr. Wetherbe for exercising his right to free speech with respect to tenure by not selecting Dr. Wetherbe for the position of Dean of the Rawls College of Business.

103.    By letter dated July 19, 2012, President Guy Bailey responded that the Faculty Grievance Procedure is not applicable.

104.    As referenced above, by letter dated August 9, 2012, to John T. Huffaker, General Counsel, Texas Tech University System, Plaintiff provided notice of his claims and copies of the "Horn Grievance" and the "Dean Grievance."

105.    Mr. Huffaker responded by letter dated August 22, 2012, that Plaintiff had exhausted his administrative remedies.

106.    TTU has failed to respond to Plaintiff's request on July 27, 2012, for a written statement of TTU's position regarding the status of his contract.

## FIRST CAUSE OF ACTION –SECTION 1983 –FIRST AMENDMENT

107.    Dr. Wetherbe incorporates by reference all of the foregoing and further alleges as follows:

108.    TTU retaliated against Dr. Wetherbe for exercising his right to free speech—as guaranteed by the First Amendment to the United States Constitution—in violation of 42 U.S.C. §1983 ("Section 1983").

109.    Specifically, Dr. Wetherbe engaged in speech regarding a matter of public concern – tenure.

110.    Dr. Wetherbe suffered an adverse employment action when (1) he was not appointed a Horn Professor; and (2) when he was not selected as Dean of the Rawls College of Business.

111.    Dr. Wetherbe's interest in commenting on matters of public concern outweighs TTU's interest in promoting efficiency.  Dr. Wetherbe's speech motivated TTU's adverse employment action.  Dr. Wetherbe suffered damages as a result of TTU's actions.

112.    In consideration of the law clearly established at the time they occurred, these deprivations and violations were objectively unreasonable.

113.    TTU is liable under Section 1983 because it officially adopted and promulgated the decision to inflict the aforementioned adverse employment actions.  TTU is also liable under Section 1983 because this decision was made by an official with whom TTU had delegated policy-making authority—Provost Bob Smith.  Therefore, TTU is liable under Section 1983 for the violation of Dr. Wetherbe's right to free speech-as guaranteed by the First Amendment to the United States Constitution.

<u>SECOND CAUSE OF ACTION–SECTION 1983–DUE PROCESS</u>

114.    Dr. Wetherbe incorporates by reference all of the foregoing and further alleges as follows:

115.    TTU failed to follow its Operating Procedures including but not limited to President Bailey's refusal to forward Dr. Wetherbe's Horn Professor nomination to the Board of Regents.

116.    TTU, acting under color of authority vested in it by the State of Texas, has indicated its intent to terminate Dr. Wetherbe's employment without due process of law in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C.A. §1983.  This claim is predicated on both procedural and substantive due process.  This claim arises both directly under 42 U.S.C.A. §1983.

<u>THIRD CAUSE OF ACTION – DECLARATORY JUDGMENT</u>

117.    Dr. Wetherbe incorporates by reference all of the foregoing and further alleges as follows:

118.    Dr. Wetherbe brings this suit for a declaratory judgment under both Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201-02.  Dr. Wetherbe seeks a declaratory judgment stating that he is entitled to the rank of Professor and that his contract is valid and cannot be terminated except upon one year's notice to be effective the beginning of the Fall Semester following the one year notice.

<u>FOURTH CAUSE OF ACTION – TEXAS CONSTITUTION</u>

119.    Dr. Wetherbe incorporates by reference all of the foregoing and further alleges as follows:

120.    Defendant has violated Article I, Sections 8 and 19 of the Texas Constitution.

## DAMAGES

121.   Plaintiff suffered monetary damages in the difference in the compensation that he would have earned as a Horn Professor, or alternatively as Dean of the Rawls College of Business, and what he has actually made.  Plaintiff has suffered irreparable harm and loss of professional stature, emotional distress, humiliation, and mental anguish.

## ATTORNEYS' FEES

122.   It was necessary for Dr. Wetherbe to hire the undersigned attorney to protect his rights.  Dr. Wetherbe is entitled to an award of reasonable attorneys' fees and costs under 42 U.S.C. § 1988(b).

## JURY DEMAND

123.   In accordance with Federal Rule of Civil Procedure 28, Dr. Wetherbe demands a trial by jury of all issues raised in this civil action that are triable of right (or choice) by a jury.

## DEMAND FOR JUDGMENT

124.   In accordance with Federal Rule of Civil Procedure 8(a), Dr. Wetherbe makes the following demand that judgment be issued in his favor on all of his claims and respectfully requests that this Court:

A.   Issue a declaratory judgment that Defendant has violated Plaintiff's civil rights;

B.   Issue a declaratory judgment that Plaintiff is entitled to the rank of Professor and that his appointment and contract is valid with a notice provision as stated in the contract;

C.   Issue an injunction requiring the President to forward Plaintiff's Horn Professorship nomination to the Board of Regents;

D.      Issue a monetary judgment for compensatory damages;

E.      Issue a monetary judgment in an amount sufficient to punish TTU for violating Plaintiff's rights, and to deter it from engaging in such action in the future (punitive damages);

F.      To the greatest extent allowed by law, issue a monetary judgment granting Dr. Wetherbe pre-judgment and post-judgment interest on all amounts to which they are entitled;

G.      Award Dr. Wetherbe reasonable attorneys' fees and costs;

H.      Award Dr. Wetherbe such additional relief as this Court deems proper and just and to which they are entitled.

## PRAYER

WHEREFORE, Dr. Wetherbe prays for judgment against TTU for the following:

a.      Injunctive relief as alleged above;

b.      Compensatory and punitive damages as alleged above;

c.      Attorneys' fees and costs;

d.      Pre-judgment and post-judgment interest;

e.      Such other and further relief, at law or in equity, to which Dr. Wetherbe may show himself justly and lawfully entitled.

Respectfully submitted,

/s/ Holly B. Williams

By: _____
        Holly B. Williams
        Texas Bar No. 00788674

**WILLIAMS LAW FIRM, P. C.**

1209 W. Texas Avenue
Midland, TX 79701
432-682-7800
432-682-1112 (fax)
holly@williamslawpc.com

**ATTORNEY FOR PLAINTIFF**
**JAMES C. WETHERBE, PH.D.**

**PLAINTIFF RESPECTFULLY DEMANDS A TRIAL BY JURY**



## WILLIAMS
LAW FIRM, P.C.

LEGAL SOLUTIONS AT WORK

BOARD CERTIFIED
LABOR AND EMPLOYMENT LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
ALSO LICENSED IN NEW MEXICO

HOLLY B. WILLIAMS
ATTORNEY AT LAW

August 9, 2012

**VIA EMAIL TO** john.huffaker@ttu.edu
**AND FEDERAL EXPRESS**
John T. Huffaker, General Counsel
Texas Tech University System
2500 Broadway
Lubbock, TX 79409

Re:     James C. Wetherbe, Ph.D. v. Texas Tech University – not yet a suit

Dear Mr. Huffaker:

I have been retained by James C. Wetherbe, Ph.D., relating to his employment with Texas Tech University.

Dr. Wetherbe having been previously tenured and promoted through the ranks to full Professor at other universities, has taken a position of resigning and not accepting tenure for personal, professional and principled reasons which are well documented within both grievances.

Dr. Wetherbe was offered tenure and declined it when he joined Texas Tech as the Robert Stevenson Chaired Professor of MIS in May 2000.  Dr. Wetherbe has stated his position publically and it is well-known.

It is our position that Texas Tech has retaliated against Dr. Wetherbe for exercising his First Amendment right to free speech about tenure.  By doing so, Texas Tech has failed to follow its own Operating Procedures (OPs) and thereby denied Dr. Wetherbe due process.  Texas Tech has indicated its intent to breach Dr. Wetherbe's contract.

Tenure is an issue of public concern as demonstrated by a piece by Naomi Schaefer Riley in the Wall Street Journal on June 24, 2012, entitled, "Should Tenure for College Professors Be Abolished?"  Provost Smith even stated during the faculty grievance hearing referenced below, "[Tenure] is not anything we want to lose particularly in the political times we're in now.  It is important that we respect and protect tenure in my opinion."

Further investigation and/or discovery may reveal additional causes of action.  With this letter, we are attempting to provide fair notice of our claims.

3535-001:68.44.doc

EXHIBIT A

Mr. Huffaker
August 9, 2012
Page 2


## The Horn Grievance

On April 26, 2012, Dr. Wetherbe filed a grievance against Provost Bob Smith pursuant to OP 32.05, Faculty Grievance Procedures, relating to his appointment as a Professor and nomination as a Horn Professor ("the Horn grievance").

In the faculty grievance hearing on July 5, 2012, Provost Bob Smith stated that Dr. Wetherbe was not qualified to be a Horn Professor because he does not have tenure. (Indeed, Provost Smith has stated variously that Dr. Wetherbe was hired "illegally," by "mistake," and that he is not qualified to be a professor.)

On July 6, 2012, the Texas Tech Faculty Grievance Committee issued its Report to President Bailey recommending, in part, as follows:

> Professor Wetherbe's contract with Texas Tech which has been in effect for the last 12 years should continue to be honored.

> We recommend that the process continue by the forwarding of the Horn Committee's ballot sheet and recommendation letter to the President and that the President subsequently forward his recommendation to the Board of Regents.

In a one-line letter to Dr. Wetherbe dated July 20, 2012, President Guy Bailey stated only: "I concur with the Provost's decision regarding your nomination for Horn Professor."

By letter dated July 27, 2012, to Dr. Bailey, Dr. Wetherbe requested clarification whether Dr. Bailey intended to present the Horn nomination to the Board of Regents at its meeting on August 9-10, 2012, and for a written statement regarding the status of his contract with Texas Tech University.

In an email on August 3, 2012, Grace Hernandez notified Dr. Wetherbe that Dr. Bailey has asked the interim president to "handle this matter."

The public posting of the agenda for the Board of Regents meeting to take place on August 9-10, 2012, does not contain an agenda item referencing a nomination for Horn Professor.

## The Dean Grievance

On June 14, 2012, Dr. Wetherbe filed a second grievance against Provost Bob Smith for denying his due process rights and/or retaliating against him for exercising his First Amendment right to free speech by not selecting him for the position of Dean of the Rawls College of Business ("the Dean grievance").

3535-001:6844.doc

EXHIBIT A

Mr. Huffaker
August 9, 2012
Page 3


By letter dated July 19, 2012, Dr. Bailey responded that OP 32.05 did not apply because the grievance relates to an administrative position and not to his capacity as a faculty member. Dr. Bailey stated in part, "you may be entitled to pursue a grievance through Texas Tech OP 70.28," Anti-Discrimination Policy and Grievance Procedure for Violations of Employment and Other Laws."

In his deposition on August 3, 2012, in the matter of *James Wetherbe, Ph.D. v. Debra Laverie, Ph.D.*; Cause No. 2012-502,988, in the 99th District Court of Lubbock County, Texas, Provost Bob Smith stated under oath that he disagrees with Dr. Wetherbe's position on tenure and that he chose not to interview Dr. Wetherbe for the position as Dean because he is non-tenured.

While we think it obvious that OP 70.28 does not apply to a claim for deprivation of due process or other constitutional claims, we have nevertheless enclosed a completed Grievance form.

As you know, the purpose of the requirement to exhaust administrative remedies is to give the employer notice of a grievance and a chance to resolve it. *Breaux v. City of Garland*, 205 F.3d 150, 163 (5th Cir. 2000). For your convenience, I have enclosed copies of the grievances and pertinent correspondence.

Please contact me if you require additional information or would like to discuss a resolution of this matter without further time and expense.


Yours very truly,

WILLIAMS LAW FIRM, P.C.

By: *Holly Williams*
Holly B. Williams


HBW:rmt
Encs.

EEO Grievance Form

Horn Grievance (Amended)

Horn Grievance Packet (provided to faculty grievance committee)
1. James C. Wetherbe, Ph.D., CV
2. Offer Letter dated 2/13/2000 from Dean Roy D. Howell to Dr. James C. Wetherbe
3. Appointment Letter dated 6/15/2000 from Provost John M. Burns to Dr. James C. Wetherbe

3535-001:6844.doc

EXHIBIT A

Mr. Huffaker
August 9, 2012
Page 4

    4.      Agreement Establishing the Bobby G. Stevenson Chair in Information Technology
    5.      Compensation Donation Agreement dated 11/20/2010
    6.      Personnel Action Forms and Appointment History
    7.      Naomi Schaefer Riley, Should Tenure for College Professors Be Abolished?, Wall Street Journal, 06/24/2012
    8.      WSJ Journal Community Vote
    9.      Post Filing of Grievance email exchange between Provost Bob Smith and Dr. Wetherbe
    10.    Dr. Wetherbe's Responses to Provost Smith's Statements

Texas Tech Faculty Grievance Committee Report to President Bailey, July 6, 2012

Dean Appointment Grievance

Dean Grievance Packet (provided to President Guy Bailey)
    1.      Horn Professor Grievance
    2.      Provost Rumor Email
    3.      Dean Search Committee
    4.      Bobby Stevenson First Letter
    5.      Provost Response to Stevenson
    6.      Bobby Stevenson Response to Provost
    7.      Letter to President Guy Bailey
    8.      Dean Nomination Acceptance
    9.      Resume and Nominations that were made available to Dr. Wetherbe
    10.    Appointment Deans Application Letter
    11.    Appointment Deans Resume
    12.    Appointment Deans Nomination Letters

July 19, 2012, Letter from President Guy Bailey to Dr. James Wetherbe

July 20, 2012, Letter from President Guy Bailey to Dr. James Wetherbe

July 27, 2012 Letter from Dr. James Wetherbe to President Guy Bailey

Email from Grace Hernandez to Dr. James Wetherbe

cc:    **VIA EMAIL TO** techpres@ttu.edu        **VIA CERTIFIED MAIL**
    President Guy Bailey                       Office of Equal Employment Opportunity
    Texas Tech University                     Texas Tech University
    Office of the President                   Administration Building, Room 212
    150 Administration Bldg., Box 42005     Lubbock, TX 79409
    Lubbock, TX 79409

1209 W. Texas Avenue, Midland, Texas 79701
432.682.7800 • 432.682.1112 Fax • HOLLY@WILLIAMSLAWPC.COM • WWW.WILLIAMSLAWPC.COM

**EXHIBIT A**



# TEXAS TECH UNIVERSITY SYSTEM™

Office of the General Counsel

August 22, 2012

Holly R. Williams
Attorney At Law
1209 W Texas Ave
Midland, TX 79701

Re: James C. Wetherbe, Ph.D. v. Texas Tech University

Dear Ms. Williams:

This will respond to your letter dated August 9, 2012.

First, let me refer to your discussion of the "Horn Grievance." As you know, Provost Smith and President Bailey declined to recommend Dr. Wetherbe to the Board of Regents for designation as a Horn Professor. Therefore, there is no item to be brought to the Board of Regents. The rules do not provide for, and past practices have not included, any type of appeal to the Board of Regents for candidates who the President does not recommend for the honor of Horn Professorship. Consequently, there is no further action to be taken within the University's procedural policies on this issue.

In your discussion on the "Dean Grievance," you state your opinion that Operating Policy 70.28 does not apply to your contemplated claim for deprivation of due process. While we strongly submit that there was no retaliation against Dr. Wetherbe, nor has there been a deprivation of his due process rights, we do agree that pursuit of a grievance under OP 70.28 is not an administrative prerequisite which must be exhausted prior to any further action Dr. Wetherbe intends to pursue. However, if you would like to pursue this grievance internally, please let me know, and I will ask our Office of Equal Employment Opportunity to proceed.

Thank you for your attention,

Sincerely yours,

John Huffaker
Vice Chancellor and General Counsel
Office of General Counsel
Texas Tech University System

Box 42021 | Lubbock, Texas 79409-2021 | T 806.742.2155 | F 806.742.2330

**EXHIBIT B**

An EEO/Affirmative Action Institution

RECEIVED AUG 3 0 2012

# JAMES C. WETHERBE
## Robert Stevenson Chaired Professor of Information Technology
## Jerry S Rawls College of Business
## Texas Tech University
jcwetherbe@aol.com
505-250-9999

## PROFESSIONAL SUMMARY

Ph.D. in Management Information Systems, Organizational Behavior, and Computer Science with over 40 years experience in academia and industry. Experience includes professorial and administrative positions in higher education including the Universities of Minnesota, Memphis, and Houston; and management positions with computing, energy, and consulting companies. Rated as one of the top 20 consultants and lecturers on MIS by *Information Week,* also ranked as one of the 20 most influential scholars in the field. Co-recipient of the first *MIS Quarterly* Distinguished Scholar Award, author or co-author of 32 books (including multiple editions) and widely published in top journals with over 6,500 citations. Brought in over $12 million in funded research during academic career. Served on the Board of several major corporations including Best Buy and CIBER. Honored as Distinguished alumnus of Texas Tech and New Mexico State Universities and in the Hall of Fame of New Mexico State University.

## POSITIONS HELD

| | | |
|---|---|---|
| TEXAS TECH UNIVERSITY<br>Lubbock, Texas | -Robert Stevenson Chaired Professor<br> of Information Technology (IT)<br>-Associate Dean Outreach<br>-Associate Dean for Research<br>-Director, Chief Executive Roundtable<br>-Director and Founder,<br> Institute for Internet Buyer Behavior | 2000-Present |
| UNIVERSITY OF MEMPHIS<br>Memphis, Tennessee | -FedEx Professor of Excellence in IT<br>-Interim Dean<br>-Director and Founder, FedEx Center<br> for Cycle Time Research | 1993 -2000* |
| UNIVERSITY OF MINNESOTA<br>Minneapolis, Minnesota | -Professor of Management Information Systems (MIS)<br>-Director of MIS Research Center<br>-Director and Founder MIS Executive Institute<br>-Director and Founder of Seminar for Systems Analysts | 1980-2000* |

*Served concurrently on Faculty of
 both universities for seven years

EXHIBIT C

| | | |
|---|---|---|
| CSC Index Group<br>Cambridge, Massachusetts | -Director of Research and Managing Consultant<br>(On leave from the University of Minnesota) | 1988-1990 |
| HOUSTON OIL/TENNECO<br>Houston, Texas | -Director, Planning and Control/CIO<br>(On leave from University of Houston) | 1978-1979 |
| UNIVERSITY OF HOUSTON<br>Houston, Texas | -Associate Professor of MIS<br>-Associate Dean Academic Programs<br>-Director Business Computing | 1977-1980 |
| IDAHO STATE UNIVERSITY<br>Pocatello, Idaho | -Director, University Computer Services<br>-Assistant Professor of MIS | 1974-1977 |
| TEXAS TECH UNIVERSITY<br>Lubbock, Texas | -Director, Research and Educational<br>Computer Services | 1973-1974 |
| NCR,<br>Lubbock, Texas<br>Dayton, Ohio | -Marketing Account Manager<br>-Computer Marketing Specialist | 1971-1973 |
| NEW MEXICO STATE UNIVERSITY<br>Las Cruces, New Mexico | -Systems Analyst<br>-Production Supervisor<br>-Supervisor, Programming<br>-Programmer | 1968-1971 |
| COMPUTING AND SOFTWARE.<br>Holloman AFB/White Sands, NM | -Programmer<br>-Data Controller | 1967-1968 |

## EDUCATION

| | | |
|---|---|---|
| PhD | Management Information Systems, Organizational<br>Behavior and Computer Science Management,<br>Texas Tech University--Distinguished Alum 2006 | 1976 |
| MBA | Management Information Systems, Texas Tech University | 1973 |
| BBA | Management/Systems Analysis, New Mexico State University<br>Distinguished Alum 1991 and Hall Fame 2003 | 1971 |
| AD | Computer Science, New Mexico State University | 1970 |

EXHIBIT C

## AWARDS AND RECOGNITION

- *MIS Quarterly*: Co-Recipient, First MIS Distinguished Scholar Award

- *InformationWeek*: Ranked as Top Twelve MIS Consultant

- Ranked 13th most influential researcher in the field of MIS, *Examining Scholarly Influence: A Study in Hirsch Metrics and Social Network Analysis*, Hirotoshi Takeda, Dissertation, Georgia State University 2011

- Research Fellow of two think-tanks: CSC Index Group, Cambridge and the Concours Group, Houston

- Editor of *DATABASE*

- Society for Information Management: Board of Directors, Conference Chairperson, Publisher and Editor *MIS Quarterly*

- Prentice Hall: MIS Series Editor

- Executive Book Summaries: *The World On Time: The 11 Management Principles That Made FedEx an Overnight Sensation*, awarded top 30 book published 1997

- Computing Newsletter: *System Analysis for Computer-Based Information Systems*: Awarded Best Systems Analysis Textbook

- Beta Gamma Sigma National Scholastic Honorary Society

- Best Buy, Board of Directors Distinguished Service Award 15 years. During tenure BBY was one of the top ten performing stocks on NYSE and was awarded best managed company by *Forbes*. Chair of Strategic Planning Committee and member of Compensation Committee.

- CIBER, Board of Directors, Chair of Compensation, Audit Committee, Nomination Committee

- Board of Directors: Dayport, Sandia Motorsports, Bizideo, and Ilostmyjob.com

- University of Memphis: FedEx Chaired Professor of Excellence in IT, founder of the FedEx Center for Cycle Time Research and  *Journal of Cycle Time Research*

- University of Minnesota, Excellence in Teaching and Distinguished Service Award, founder of the MIS Executive Institute and  the Seminar for the Systems, Publisher and Editor *MIS Quarterly*

EXHIBIT C

- Texas Tech University: Robert Stevenson Chaired Professor, Distinguished Alum Award 2006, Dean's Advisory Council, Excellence in Teaching Executive MBA Award, Nominated for Horn Professorship

- New Mexico State University: Distinguished Alum Award 1991, Hall of Fame Award 2003, Alum Selfless Acts Award 2005, Dean's Advisory Council

## BOOKS

- ***Achieving High Performance Friendship,*** with John Vawter, Mead Publishing 2012.

- ***So, What's Your Point?,*** *with Bond Wetherbe,* Fourth Edition, Mead Publishing, Houston, Texas 2012.

- ***Hispanic Heresy: What is the Impact of America's Largest Population of Immigrants?***, with Angel Reyes and Brad Ewing, Mead Publishing, Houston, Texas 2009.

- ***Information Technology for Management: Transforming Business in the Digital Economy***, with Turban, Leidner and McLean, John Wiley & Sons, Inc., New York, New York, Sixth Edition 2008, Spanish Edition, Bookman 2010.

- ***Faith Logic***, Mead Publishing, Houston, Texas 2007.

- ***Information Technology for Management***: ***Transforming Organizations in the Digital Economy,*** fifth edition, with Turban and McLean, John Wiley & Sons, Inc., New York 2006, Chinese Edition 2007.

- ***So, What's Your Point?,*** Third Edition, with Bond Wetherbe, Mead Publishing, Houston, Texas 2006.

- ***Information Technology for Management: Transforming Organizations in the Digital Economy,*** Fourth Edition, with Turban and McLean, John Wiley & Sons, New York, 2004.

- ***God.online***, Mead Publishing, Houston, 2003.

- ***Information Technology for Management: Transforming Business in the Digital Economy,*** Third Edition, with Turban and McLean, John Wiley & Sons, Inc., New York 2002.

- ***Information Technology for Management: Making Connections for Strategic Advantage***, Second Edition, with Turban and McLean, John Wiley & Sons, Inc., New York, 1999.

EXHIBIT C

- ***The World on Time*: The *11 Management Principles that Made FedEx an Overnight Sensation*,** *Knowledge* Exchange, Santa Monica, California, Aug 1996.  **Awarded Top 30 Business Book of 1997.**

- ***So, What's Your Point?,*** Second Edition, with Bond Wetherbe, Mead Publishing, Houston, Texas 1996.

- ***Information Technology for Management: Improving Quality and Productivity,*** with Turban and McLean, John Wiley & Sons, Inc., New York, January, 1996.

- ***Systems Analysis and Design: Best Practices***, with Nick Vitalari, West Publishing, St. Paul, Minnesota, 1994.

- ***Case Studies in Best Practice***, with Nick Vitalari, West Publishing, St. Paul, Minnesota, 1994.

- ***So, What's Your Point?,*** with Bond Wetherbe, Mead Publishing, Houston, Texas 1993.

- ***Cases in Systems Analysis and Design Specification***, West Publishing, St. Paul, Minnesota, 1988.

- ***Systems Analysis & Design***, Third Edition, West Publishing, St. Paul, Minnesota, 1988.

- ***Computer Information Systems for Business***, with Thomas Dock, West Publishing, St. Paul, Minnesota, 1988.

- ***Readings in Information Systems***, with Dock and Mandell, West Publishing, St.  Paul, Minnesota, 1988.

- ***Proceedings of the Seventh International Conference on Information Systems***, Editor, San Diego, California, December 15-17, 1986.

- ***Proceedings of the Sixth International Conference on Information Systems***, Editor, Indianapolis, Indiana, December 16-18, 1985.

- ***Proceedings of the Twenty-First Annual Computer Personnel Research Conference***, Editor, Minneapolis, Minnesota, May 2-3, 1985.

- ***Management of Information Systems Casebook***, with Gary Dickson, McGraw-Hill Book Company, New York, 1985.

- ***Management of Information Systems***, with Gary Dickson, McGraw-Hill Book Company, New York, 1985.

- ***Introduction to COBOL Programming,*** Series Editor with Dennis Galletta, Prentice-Hall, Englewood Cliffs, New Jersey, 1985.

EXHIBIT C

- *Structured FORTRAN for Business,* Series Editor with Charles Paddock, Prentice-Hall, Englewood Cliff, New Jersey, 1985.

-  *Structured BASIC for Business,* Series Editor with Nicholas Vitalari, Prentice-Hall, Englewood Cliffs, New Jersey, 1985.

- *Cases in Structured Systems Design*, Second Edition, West Publishing, St. Paul, Minnesota, 1984.

- *Systems Analysis and Design: Traditional, Structured, and Advanced Techniques*, Second Edition, West Publishing, St. Paul, Minnesota, 1984.

- *Executive's Guide to Computer-Based Information Systems*, Prentice-Hall, Englewood Cliffs, New Jersey, 1983.

- *Systems Analysis for Computer-Based Information Systems*, West Publishing, St. Paul, 1979. Rated best Systems Analysis Text by Computing Newsletter, September 1979, Portuguese translation by West Publishing

- *Cases in Systems Design*, West Publishing, St. Paul, Minnesota, 1979.


**SELECTED ARTICLES/PAPERS**

- *Corporate Sponsorship of Academic Research: The Trend, Its Drivers, and Its Implications,* with Jeff Baker, under review, *CAIS* 2012.

- *An Empirical Examination of RFID Adoption in the Healthcare Industry,* with Qing Cao and James Hoffman, under review *Decision Sciences* 2012.

- *A Paradigm Shift of Concept of Service: An Empirical Test of the New Concept of Service with Triangle Model,* with Jaeki Song and Sangno Lee, under review *Journal of Service Research* 2012.

- *The Strategic Alignment of Information Systems: An Empirical Study of CEO Perspectives and firm Performance in the Healthcare Industry*, with Jaeki Song, Sangno Lee, Qing Cao, and Donald Jones, under review, *Decision Sciences* 2012

- *Computerized Physician Order Entry Systems Adoption in Hospitals: A Holistic Approach,* with Qing Cao and Vicki Qing Cao, forthcoming, *International Journal of Electronic Healthcare,* 2012.

- *Examining Online Consumers' Behavior: A Service-Oriented View,* with Jaeki Song, Jeff Baker and Sangno Lee, *International Journal of Information Management,* 2012.

- *The Commoditization of IT: Evidence from a Longitudinal Text Mining Study,* with Sangno Lee, Jaeki Song, Jeff Baker and Youngjin Kim, *Communications of the Association for Information Systems,* Volume 29, No. 1, 2011.

EXHIBIT C

- *Technologies that Transform Business and Research: Lessons from the Past as We Look to the Future,* with Gordon Davis, Jeff Baker, Michel Avital, Frank Land, Howard Morgan, *Communications of AIS,* Volume 22, January 2011.

- *Examining Online Consumers' Behavior on Retail Websites,* with Jaeki Song, Jeff Baker, Sangno Lee, Proceedings of the10[th] Decision Sciences Institute International Conference, Paris, France June 2009.

- *Online Consumer's Switching Behavior: A Buyer Seller Relationship Perspective,* with Dahui Li and Glenn Browne, Chapter XIV, *Contemporary Research in E-Branding* edited by Subir Bandyopadhyay, Information Science, New York, 2009, Reprinted: Chapter II, *Organizational Development and Electronic Commerce: Emerging Issues for Advancing Modern Socioeconomies* edited by Mehdi Khosrow-Pour, Information Sciences, New York 2009.

- *Estimating the Effect of Non-English Speaking Hispanic on Personal Injury Trial Outcomes*, with Brad Ewing and Angel Reyes, published as part of *Politics and Justice for Hispanics in America, Hispanic Heresey: What is the Impact of America's Largest Population of Immigrants,* 2009.

- *Examination and Comparison of Hispanic and White Unemployment Rates*, with Ewing, Brad, Angel Reyes and Mark Thompson, Journal of Business Valuation and Economic Loss Analysis,Volume 3, Issue 1, 2008.

- *Cognitive Stopping Rules for Terminating Information Search in Online Tasks,* with Glenn Browne and Mitzi Pitts, MIS Quarterly, Vol. 31, No. 1, March 2007.

- *Online Consumers' Switching Behavior: A Buyer-seller Relationship Perspective,* with Dahui Li and Glenn Browne, Journal of Electronic Commerce, Vol. 5, No. 1, March 2007.

- *Why Do Internet Users Stick with a Specific Website? A relationship Perspective,* with Dahui Li and Glenn Browne, International Journal of Electronic Commerce, Vol.10, No. 1, 2006.

- *Give a Little, Get a Little*, with Eric Walden, Harvard Business Review, September 2005.

- *Consumer Reactions Toward Clicks and Bricks: Investigating Buying Behavior On-line and at Stores,* with Browne, Glenn and John Durret, Behavior & Information Technology, Vol. No. 4, July-August 2004.

- *Keep Products and Services seamless for the Customer* and *Mass Customize Your Rewards,* Guidelines for Excellence in Management, Edited by Jack Ivancevich, South-Western Thomson, 2004.

- *Recognizing Functionality of the Future,* with Glenn Browne, Competing in the Information Age, edited by Jerry Luftman, Wiley 2003.

- *Every Corporate Board Needs an Academician,* Keynote for AMCIS Conference, Tampa, 2003.

- *Leaders of the New Century,* with Steve Forbes, Michael Dell, Jack Welch, Charles Schwab and Jimmy Carter, CD produced by Network Publish Broadcasting, Edition no. 8, 2002.

EXHIBIT C

- *Ascension Health System: An Enterprise User Interface Approach to Organizational Systems Delivery*, with Janz, B.D., Sujitparapitaya, S., and Sammet, D., Cycle Time Research, Volume 6, Number 1, 2001.

- *Finding Funding: External Strategies to Offset Inadequate University Funding*. Proceedings of the Seventh Americas Conference on Information Systems 2001.

- *Research Center Models For Attracting Corporate Funding,* Communications of the Association for Information Systems, Volume 7, Article 7, August 2001.

- *Cycle Time Reduction:  Concepts and Case Studies,* with Frolick, Mark N., Communications of the Association for Information Systems, Volume 3, Article 13, May 2000.

- *Motivating, Enhancing, and Accelerating Organizational Learning; Improved Performance Through User-Engaging Systems,* with Janz, Brian D., Cycle Time Research, Volume 5 Number 1, 1999.

- *Information and Computer Use Among Knowledge Workers:  Differences Between More and Less Innovative Middle Managers,* with T. J. Larsen, Information and Management, Volume 36, Number 2, August 1999.

- *Talking Tech to the CEO: Add a Story to Your Stats,* Compuware InTelligence, Volume 2 Number 4, 1999.

- *Information Technology, Culture, and Learning at Federal Express,* with Janz, Brian D., Journal of Global Information Technology Management, Volume 1 Number 1, Winter 1998.

- *The Emergence of Hypertext and Problem Solving: An Experimental Investigation on Accessing and Using Information from Linear and Nonlinear Systems,* Ramarapu, Narender, Mark N. Frolick, Ronald B. Wilkes, and James C. Wetherbe, Decision Sciences Journal, March 1998.

- *Technology and Time: Competing for Customers in the Future,* Cycle Time Research, Volume 4 Number 1, 1998.

- *Reengineering the Systems Design Process: The Link Between Autonomous Teams and Business Process Outcomes,* with Janz, B.D., Davis, G.B. and Noe, R.A., Journal of MIS, Summer, 1997.

- *Key Issues in Information Systems: Delphi Results,* with Jim Brancheau and Brian Janz, MIS Quarterly, Volume 20 Number 2, June 1996.

- *Federal Express Corporation: An Overnight Success,* Hemispheres, December, 1996.

- *Four Steps to Information Requirement Determination*, with Gordon Davis, MIS Encyclopedia of Management, June, 1996.

- *Just-in-Time Research: Reducing Cycle Time and Achieving Research Results for Business Practice,* with Davis, Gordon B. and Vitalari, Nicholas P., Cycle Time Research, Volume 1, Number 2, 1996.

- *Reducing the Cycle Time of the Financial Aid Application and Approval Process at Universities,* with Schultz, Margaret R. and Frolick, Mark N., Cycle Time Research, Volume 1, Number 2, 1996.

- *Principles of Cycle Time Reduction: You Can Have Your Cake and Eat it Too,* Cycle Time Research, Volume 1, Number 1, 1995.

EXHIBIT C

- *Complete, Pareto, and No Inventory Alternative Strategies for Retail Inventory,* with Retzlaff-Roberts, Donna and Nichols, Ernest, L., Cycle Time Research, Volume 1, Number 1, 1995.

- *Cycle Time Reduction: An Inter-Organizational Supply-Chain Perspective,* with Nichols, Ernest L. and Frolick, Mark,  Cycle Time Research, Volume 1, Number 1, 1995.

- *A Comparative Analysis of MIS Project Selection Mechanisms,* with McKeen and Guimaraes, DataBase, August, 1994.*Increasing Productivity and Job Satisfaction by Motivating Employees*, with Wetherbe, M.B, in, Handbook of Data Center Management, Auerbach Publications, 1994.

- *The Relationship Between User Participation and User Satisfaction:  An Investigation of Four Contingency Factors,* with McKeen, James D. and Guimaraes, T. MIS Quarterly, Volume 18, Number 4, December 1994.

- *Reengineering to Reality,* with Janz, Brian D., Journal of Education for MIS, Volume 2 Number 1, 1994.

- *Increasing Productivity and Job Satisfaction by Motivating Employees*, with Wetherbe, M.B, in, Handbook of Data Center Management, Auerbach Publications, 1994.

- *A Comparative Analysis of MIS Project Selection Mechanisms,* with McKeen and Guimaraes, DataBase, August, 1994.*Increasing Productivity and Job Satisfaction by Motivating Employees*, with Wetherbe, M.B, in, Handbook of Data Center Management, Auerbach Publications, 1994.

- *Key Trends in Systems Development in Europe & North America*, with Vitalari & Milner, Journal of Global Information Management, Idea Group Publishing, Volume 2. No. 2, 1994.

- *Contingency Factors Affecting User Participation and User Satisfaction:  Task Uncertainty, User Influence, and User-Developer Communication,* with Guimaraes and McKeen, Data Base, February, 1994.

- *Individual Motivation Profiles:  The Key to Increased Productivity and Job Satisfaction,* with M. Bond Wetherbe, Information Management, Auerbach Publishers, New York, New York, Summer 1993.

- *Update on MIS Research: A Profile of Leading Journals and U.S. Universities,* with Lending, Database, Volume 23, No. 3, Summer 1992.

- *Executive Information Requirements:  Getting It Right,* MIS Quarterly, Vol 15 No. 1, March 1991.

- *Information Systems Management Issues of the 1990's*, MIS Quarterly, Vol. 15, No 4, with F. Neiderman and J.C. Brancheau, December, 1991.

- *A Comparison of Perceptions about Information Center Success,* with Leitheiser, Information & Management, Volume 21, 1991.

- *Practitioners' Perspective on the MIS MBA,* with Carlson, The Journal of Computer Information Systems, Summer 1991.

- *Designing an End-User Computing Management and Support Program,* with Brancheau and Leitheiser, Information Management, 1990.

- *Information Architecture:  Sharing the Sharable Resource,* with Vogel, Cause and Effect, Summer 1991.

EXHIBIT C

- *The Adoption of Spreadsheet Software:  Testing Innovation Diffusion Theory in the Context of End-User Computing,* with Brancheau, James C., Information Systems Research, Volume 1 Number 2, June 1990.

- *Mixing Prototyping and Data Modeling for Information-System Design,* with Alavi, IEEE Software, Volume 8 No. 3, May 1991.

- *Corporate Acquisition:  MIS Can Rise to the Challenge,* Tech Exec, April 1990.

- *Information Technologies for the 1990's:  An Organizational Impact Perspective,* with Straub, D.W., Communications of the ACM, Vol. 32, No. 11, November 1989.  Translated in Management en Organisaties van automatieringsmiddelen 1990. 1993.

- *Understanding Innovation Diffusion Helps Boost Acceptance Rate of New Technology,* with Brancheau, James C., CIO Journal, Vol. 2, No. 2, Fall 1989.

- *The MIS Conundrum-Centralization or Decentralization,* Chief Financial Officer USA, 1988.

- *A Survey of 4GL Users and Applications,* with Lehman, John A., Journal of Information Systems Management, Vol. 6, No. 3, Spring 1989.

- *Should the Information Systems Function be Centralized or Decentralized,* Chief Financial Officer Journal, September, 1988.

- *Higher and Lower Rated Information Centers:  Exploring the Differences,* with Brancheau, James C., Journal of Information Management, Vol. IX, No. 1, Spring 1988.

- *The Shared Environment: Determining Responsibility for End-User Computing Support,* with Brancheau, James C. and Leitheiser, Robert L., Data Processing Management, February 1988.

- *Rational Framework for Centralizing or Decentralizing Information System Management Functions,* Information Technology, Vol. 1, No. 3, May 1987.  Reprinted in I/S Analyzer, Vol. 25 No. 11, November, 1987.

- *Allocating Responsibility for End-User Computing Support:  Who's Responsible in the `Shared' Environment,* with Brancheau, James C. and Leitheiser, Robert L, Systems Development Management, October 1987.

- *Key Issues in Information System's Management,* with Brancheau, James C., MIS Quarterly, Vol. 11, No. 1, March 1987.

- *Alternative Strategies for Organizing the IS Function,* with Vogel, Douglas R., and Roger, Craig A., Information Management Review, Vol. 2, No. 4, Spring 1987.

- *Information Architectures:  Methods and Practice,* with Brancheau, James C., Information Processing and Management, Vol. 22, No. 6, December 1986.

- *Service Support Levels: An Organized Approach to End-User Computing,* with Robert L. Leitheiser, MIS Quarterly, Vol. 10, No. 4, December 1986.

- *Addressing Behavioral and Leadership Issues to Improve Project Management,* with Annett, Paul, Information Strategy: The Executive's Journal, Vol. 2, No. 3, Spring 1986.

EXHIBIT C

- *Approaches to End-User Computing:  Service May Spell Success,* with Leitheiser, Robert L., Journal of Information Systems Management, Vol. 3, No. 1, Winter 1986.

- *An Investigation of the Information Center from the User's Perspective,* with Brancheau, James C. and Vogel, Douglas R., Data Base, Fall 1985.

- *An Empirical Study of Occupational Stress, Attitudes, and Health Among Information Systems Personnel,* with Ivancevich, John M. and Napier, H. Albert, Information and Management, Vol. 9, No. 2, September 1985.

- *Profile of MIS Research: Methodology and Journal Preference,* with Vogel, Douglas R., Journal of Data Education, Vol. 25, No. 3, Spring 1985.

- *Information Centers: A Survey of Services, Decisions, Problems, and Successes,* Journal of Information Systems Management, Vol. 2, No. 3, Summer 1985.

- *University Planning:  Developing a Long-Range Information Architecture,* with Vogel, Douglas R., Planning & Changing, Vol. 15, No. 3, Fall, 1984.

- *MIS Research: A Profile of Leading Journals and Universities,* with Vogel, Douglas R., Data Base, Vol. 16, No. 1, Fall 1984.

- *Key Information Systems Issues for the 1980s,* with Dickson, Gary W., Leitheiser, Robert, and Nechis, Mal, MIS Quarterly, Vol. 8, No. 3, September 1984.  Reprinted/Reviewed in Spectrum, September 1984 and Information Systems for Management, BPI Inc., 1987.

- *Trends in End-User Computing,* with Robert Leitheiser, Auerbach Information Management Series, July 1984.

- *Empirical Investigations of System Development Practices and Results,* with Jenkins, A. Milton and Naumann, David, Information and Management, Vol. 7, No. 2, April 1984.

- *Advanced System Development Techniques Avoid 'Analysis by Paralysis',* Data Management, February 1984.

- *Occupational Stress, Attitudes, and Health Problems Among the Information Systems Professional,* with Ivancevich, John M. and Napier, H. Albert, Communications of the ACM, Vol. 26, No. 10, October 1983.

- *Computer Capacity Planning:  Strategy and Methodologies,* with Carper, I. Lynne and Harvey, Susan, Data Base, Vol. 14, No. 4, Summer 1983.

- *MIS -- Steps to Success,* Datamation, July 1983.

- *What the MIS Executive Needs to Know About Robotics,* with Conrad, Scott J., Journal of Systems Management, May 1983.

- *What the Big Companies are Looking for in MIS Graduates,* with Napier, H. Albert, Journal of Data Education, Vol. 23, No. 2, Winter 1982-83.

- *Three Stage Model of MIS Planning,* with Bowman, Brent and Davis, Gordon B., Information and Management, Vol. 6, No. 1, March 1983.

- *A General Purpose Decision Support System for High-Quantity, Low Quality Data,* with Steinberg, Earle, Management Decisions, 1982.

EXHIBIT C

- *Advanced Approaches to Systems Development,* Auerbach Information Management Series, December 1982.

- *Traditional Approaches to Systems Development,* Auerbach Information Management Series, December 1982.

- *Computer Graphics: A Management Perspective,* with Rademacher, Donald, Journal of Systems Management, December 1982.

- *Reducing Complexity in Information Systems Planning,* with Alavi, Maryam, Systems, Objectives, Solutions, August 1982.

- *MIS Executives' Perspectives on MIS Curriculum,* with Napier, H. Albert, Interfaces, April 1982.

- *Decision Impelling Differences:  An Investigation of Management by Exception Reporting,* with Judd, Phillip and Paddock, Charles, Information and Management, November 1981.

- *Implementing Automated Office Systems,* with Dykman, Charlene and Davis, Charles K., Journal of Systems Management, August 1981.

- *Modeling for MIS,* with Bowman, Brent and Davis, Gordon B., Datamation, July 1981.

- *Planning and Controlling Distributed Data Processing,* with Davis, Charles, Systems, Objectives, Solutions, March 1981.

- *Impact of DDP on Organizations in the 1980's* with Davis, Charles, Auerbach Information Management Series, March and April 1981.

- *The Role of Zero-Based Budgeting in the Strategic Planning Process,* with Montanari, John R., Journal of Strategic Planning, March 1981.

- *Toward a Comprehensive Framework for MIS Research,* with Nolan, Richard, MIS Quarterly, June 1980.

- *A Decision Support System for the Planning and Control of a Chargeout System in a Large-Scale Computing Environment,* with Davis, Charles, Data Base, June 1980.

- *Employee Behavior -- Scheduling is the Trigger,* with Justis, Robert, Data Management, January 1980.

- *An Analysis of the Impact of Distributed Data Processing on Organizations in the 1980's,* with Davis, Charles, MIS Quarterly, December 1979.

- *Zero-Based Budgeting:  An Alternative to Chargeout Systems,* with Dickson, Gary W., Information and Management, Vol. 2, No. 3, November 1979.  Reprinted in EDP Solutions, August 1980.

- *Employee Behavior -- Reinforcement is the Trigger,* with Justis, Robert, Data Management, November 1979.

- *Heuristic Development:  A Redesign of Systems Design,* with Berrisford, Thomas R., MIS Quarterly, March 1979.

- *Cost Analysis of Computer Maintenance Contract,* with Bateman, Barry L., MIS Quarterly, December 1978.

EXHIBIT C

- *Development and Application of Industry-Based Cases in Systems Analysis and Design,* Journal of Data Education, October 1978.

- *A Systems Specifications Model for Instruction in Systems Analysis and Design,* Journal of Data Education, October 1978.

- *A Strategic Planning Methodology for the Computing Effort in Higher Education:  An Empirical Evaluation,* with Dock, V. Thomas, Communications of the ACM, December 1978.

- *A Model for Minicomputer Maintenance Evaluation and Penalty Compensation,* with Bateman, Barry L. and Westman, Chadwick H., Mini and Micro Processors, 1978.

- *Computing in Higher Education:  A Structured Approach for Committee Planning,* with Cornette, William, Journal of Data Education, October 1977.

- *A Contingency View of Managing the Data Processing Organization,* with Whitehead, Carlton, MIS Quarterly, March 1977.

- *Breaking the Description Dilemma: Personnel Selection by Group Analysis,* with Dock, V. Thomas, Data Management, December 1976.

- *Production Analyst:  A New Position for an Old Problem,* with Bateman, Barry L., Data Management, December 1975.

- *DATAEDIT: A Generalized Edit Program for Research Data,* Journal of Marketing Research, Nov 1975.

EXHIBIT C



TEXAS TECH
U N I V E R S I T Y

College of Business Administration
Office of the Dean

Lubbock, TX 79409-2101
(806) 742-3188   FAX (806) 742-1092

February 14, 2000

Dr. James C. Wetherbe
8309 Racheleigh NE
Albuquerque, NM 87109

Dear Jim:

Although formal invitations to join our faculty
are issued by the Provost of the University, I want to
put on paper the offer I recently discussed with you.
The position is as The Bobby G. Stevenson Chair of
Information Technology and Professor of ISQS, at a
nine-month salary of $200,000.  The Stevenson Chair
appointment is for three years and is renewable subject
to review as outlined in the agreement establishing the
Chair. As previously discussed, the initial appointment
will be one-half time at a salary of $100,000,
beginning May 1, 2000. If either you are we want to
change the terms of this appointment, it can be done by
mutual agreement with one year notice to be effective
at the beginning of the Fall Semester following the one
year notice.  We, also understand that you reject
tenure.

The state contributes 6.0% of your annual income
to the pension plan of your choice; you would
contribute 6.65%.  Both your and the state's
contributions are tax sheltered.  The state also
contributes a maximum of $4,460 a year toward family
health insurance coverage.  The individual employee
contributes a maximum of $2,288. (These health
insurance contributions apply for the year 1999-00.)

*An EEO/Affirmative Action Institution*

EXHIBIT D                    JW-000029

Dr. James C. Wetherbe
Page 2
March 14, 2000


If you accept this offer, please sign and date
this letter and return it to me not later than <u>March
25, 2000</u>. Also, please send a <u>copy</u> of your social
security card, the date and place of your birth, and
forward to me official transcripts of all your academic
work. This information and material is necessary to
initiate your appointment form, which will be forwarded
to you at a later date by the office of the University
Board of Regents.

If there are any details that we have overlooked
or if you have any questions, please do not hesitate to
phone either me. We genuinely hope you will decide to
join us and look forward to hearing from you.

Most cordially yours,

Roy D. Howell
Dean

Enclosures

cc:  Dr. John Burns, Provost

REDACTED

Dr. James C. Wetherbe
Page Three
March 14, 2000


_James C. Wetherbe_
SIGNATURE

▮▮▮▮▮▮▮▮▮
SOCIAL SECURITY NUMBER

4-16-2000
DATE

6-28-48

Nantucket Mass
DATE/PLACE OF BIRTH


COPY OF SOCIAL SECURITY CARD:


*Personnel File*

# TEXAS TECH
## UNIVERSITY

Office of the Provost

Box 42019
Lubbock, TX 79409-2019
(806) 742-2184

June 15, 2000

Dr. James C. Wetherbe
Business Administration
Mail Stop 2101

Dear Dr. Wetherbe:

It is a pleasure for me to extend a formal invitation to you to join the faculty of Texas Tech University. The appointment for which you have been recommended is at the rank of Bobby G. Stevenson Chair in information Technology in the Department of ISQS, College of Business Administration, with a salary of $200,000 for a nine month appointment beginning May 2, 2000, through May 31, 2001.

Please let me know of your willingness to accept this offer by signing the bottom portion of this letter and returning it by June 26, 2000, to the attention of Jessica Carrillo.

We look forward to your being on campus.

Sincerely,

John M. Burns
Provost

JMB/jc

cc:  Dean Howell
     Dr. Surya Yadav


ACCEPTED:

_____
Dr. James C. Wetherbe


*An EEO / Affirmative Action Institution*

AGREEMENT ESTABLISHING
THE BOBBY G. STEVENSON CHAIR
IN
INFORMATION TECHNOLOGY

**Parties:**

This agreement is made and entered into this __1ᵀᴴ__ day of __July__ , 1998, by and between Bobby G. Stevenson of Englewood, Colorado ("the Donor"); Texas Tech University, a state institution of higher learning, acting by and through its Chancellor ("the University"); and Texas Tech Foundation, Inc., a Texas non-profit corporation, acting by and through the Chair of its Board of Directors ("the Foundation").

**Purpose:**

The University and the Foundation hereby record their sincere gratitude and deep appreciation to the Donor for his generosity in establishing the Bobby G. Stevenson Chair in Information Technology ("the Chair"). The University welcomes this splendid endowed Chair that will forever honor the accomplishments of the Donor. The endowment ("Endowment") is created through a gift in the sum of $2,000,000 which shall constitute the corpus and principal of the Endowment.

The primary objective of the Bobby G. Stevenson Chair is to strive for excellence in the field of Information Technology by providing students with a thorough understanding of the related areas. Additionally, this Endowment should enable the School of Business Administration to attract a nationally recognized scholar in Information Technology who will become a mentor to students receiving Stevenson Scholarships and Fellowships (Stevenson Scholars) pursuant to a separate charitable donation. Recipients of Stevenson Scholarships and Fellowships, along with other students in the college, will have direct, personal access to a world-class scholar who can take a continuing interest in their development, academic and professional as well as personal.

**Fund Administration:**

The Foundation hereby agrees to assume the responsibility in perpetuity for managing the Endowment, investing and reinvesting its assets, and utilizing and accounting for the investment income to provide for the Bobby G. Stevenson Chair in Information Technology in accordance with the provisions set forth below.

The corpus of the Endowment shall be kept intact in perpetuity and separately accounted for; provided, however, that the funds may be commingled for investment purposes.

-1-

Spendable income generated by the investment of the principal and corpus of the Endowment shall be used as directed by the University's spending policy to accomplish the purpose of the Endowment.

The Endowment shall be managed in accordance with the endowment policies and procedures of the University and the Foundation as they currently exist or may be amended from time to time.

Notwithstanding any other provision within this memorandum of agreement, the Endowment and all subsequent additions to the Endowment of at least $1,000 will be invested in the Short/Intermediate Term Investment Fund of the University for the first twelve months after establishment of the Endowment or after such addition is made. Income earned on the Endowment or addition during that period of time, up to but not exceeding five-percent (5%) of the Endowment or addition, shall be used to offset expenses associated with fund raising at the University. Income earned in excess of five-percent (5%) shall be added to the Endowment.

**Recipient Qualifications:**

The recipient of this Chair is expected to possess, minimally, the following qualifications:

a) A strong national reputation as a leader in an area of Information Technology.
b) A demonstrated commitment to teaching and mentoring students.
c) A Ph.D. degree in Information Technology or a closely allied field, or the equivalent in industry experience and skills over not less than ten years.
d) A U.S. born citizen with all relevant degrees (undergraduate, masters, and Ph.D. if applicable) from U.S. institutions.
e) Preference will be given to a graduate of Texas Tech University. If no graduate of Texas Tech University meeting the above criteria is available, preference will be given to a scholar whose background suggests that he or she will be able to relate well with students from the West Texas area who are the recipients of Stevenson Scholarships and Fellowships.

**Recipient Obligations:**

The selected chairholder's obligations will include:

a) continuing a high-quality, high-visibility research program, and with serving as a mentor to other faculty in the college;
b) teaching at all levels within the college, consistent with the University Faculty Workload Policy;
c) service to the college, university, and community;
d) developing curricula and programs designed to increase students' awareness of the importance and impact of the choices they make in their daily lives;

-2-

EXHIBIT F                                                  JW-000036

e) equipping students with the tools and skills required to make better decisions in all phases of their lives;
f) The holder of the Bobby G. Stevenson Chair in Information Technology will serve as a mentor for all recipients of Stevenson Scholarships and Fellowships.
g) The Stevenson Chair will be a personal counselor and advisor to the Stevenson Scholars, monitoring their progress, and guiding them through their college career. That is, a personal, one-on-one relationship between the Stevenson Chair and Stevenson Scholars is expected.

## Guidelines for Award:

The following guidelines shall be used in selecting the recipient of this Chair:

a) Continuous high-level professional performance shall be the principal criterion for the initial award of the chair, with continuing award based upon outstanding discharge of the obligations set forth above.
b) The Chair will be awarded on a three (3) year basis and may be reawarded as many times as the recipient's performance, based on a comprehensive performance review, justifies the award, provided, however, that in no event shall one recipient be awarded the chair more than five (5) times.
c) A Search and Performance Review Committee consisting of the following:
   1) Dean of the College of Business Administration,
   2) the Coordinator of the Area of Information Systems and Quantitative Sciences,
   3) two chaired or Horn Professors from the college, selected by the Provost of the University, and
   4) one recognized expert in the field of Information Technology from outside the university, selected by the Provost of the university

will review all candidates and make their recommendation to the Dean for approval and appointment or reappointment. The Donor will serve as an ex-officio advisor to the committee, and the committee will, during the selection or reappointment process, consult with the Donor to insure that the objectives of the Bobby G. Stevenson Chair are fulfilled. The Donor shall have the right to meet with the candidate(s), and to express his satisfaction or dissatisfaction with the person proposed to be selected as the Chair-holder prior to final selection or reappointment, and the Committee commits to use its best efforts to resolve any concerns of the Donor.

## Reporting:

The Foundation shall furnish to the Donor, at least annually, a report, reflecting the performance of the investment programs of the Foundation since the date of the last report.

## Continuation of Chair:

EXHIBIT F                                             JW-000037

The Bobby G. Stevenson Chair in Information Technology shall continue as set forth above and shall not be changed within twenty years of the establishment of the Endowment.  If, after twenty or more years from the establishment of the Endowment, the field of Information Technology has become obsolete or archaic, the President of the University shall redesignate the Endowment into such other field within the College of Business Administration deemed most nearly to carry out the intentions of the Donor with respect to such funds.

**Non-Reversion:**

The Donor agrees that he has divested himself of all tenants of control of the Endowment and that the Endowment shall be operated in perpetuity as set out herein.  In no event shall any of the principal or corpus of the Endowment or any income earned thereon revert to the Donor, his heirs, successors, or assigns.

In the event the Foundation dissolves, whether voluntarily or involuntarily, all of the corpus of the Endowment shall be transferred to and become the property of the University.  However, in such instance the continuation of the Endowment shall not be affected, including the investment accounting and spending thereto as otherwise stipulated herein.

Executed on the date first written above.

Donor

Texas Tech University

_____
John T. Montford, Chancellor

Texas Tech Foundation, Inc.

_____
David Seim, Chair

-4-

# Texas Tech
## Personnel Action Form

**EMPLOYEE DEPARTMENT INFORMATION**

| EMPLOYEE NAME (Last Name, First Name, Middle Name): Wetherbe, James, C. | DR. X MR. MS. | SOCIAL SECURITY #: 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 | DATE PAF PRODUCED: 4/28/00 | COUNTY NAME: |

| HOME DEPT CODE: BAB05 | HOME DEPT NAME/ADDRESS/MAIL STOP: COBA/ISQS/2101 | HOME DEPT SUPERVISOR SSN: |

| PREPARING DEPT: Same | CONTACT PERSON: Cindy Ontiveros | CONTACT ADDRESS/MAILSTOP: COBA/2101 | CONTACT PHONE: 2-1552 |

---

| INDICATE THE APPROPRIATE ACTION(S) | 01 |

- 01 - Initial Appointment (Attach copy of Social Security Card)
- 02 - Leave With Pay
- 03 - Leave Without Pay
- 04 - Return From Leave
- 05 - Separation from Tech (Attach Lump Sum Certification Form)
- 06 - Promotion
- 07 - Salary Exception (See Salary OP 70.14)
- 08 - Demotion
- 09 - Change Percent FTE
- 10 - Transfer Within Tech
- 11 - Other (Please Explain)
- 13 - Statutory Increase
- 14 - ___ Increase
- 15 - ___ to Class Minimum
- 17 - Reappointment
- 21 - Change Account Funding

| ACTION EFFECTIVE DATE: 5/1/00 | | EXPLAIN ACTIONS AND/OR GIVE ADDITIONAL COMMENTS. JUSTIFICATION MUST BE ATTACHED TO TRANSFER PRIOR MONTH(S) SALARY EXPENSES |
|---|---|---|
| LAST DAY PAID | SEPARATION REASON | |
| LEAVE END DATE | LEAVE REASON | |
| LAST DAY WORKED | | |

| NEW POSITION: Y ___ N ___ If yes, attach authorization | REQUISITION NUMBER: 2001TLF D31 | REPLACEMENT FOR: ___ SSN: ___ | BENEFITS ELIGIBLE? Yes X No ___ | FACULTY ONLY: ___ Non-Tenured (N) ___ Tenure Track (P) ___ Tenured (Y) | BASE SALARY: | STATUS: |

---

## PREVIOUS APPOINTMENT DATA

| TOTAL FTE: | HOURLY WAGE: | SHIFT: 10% ___ FLAT $ ___ | MONTHLY SALARY: | F-T ACADEMIC BASE: (9 Month Base) | F-T ANNUAL BASE (12 Month Base) |

| ACCOUNT NUMBER / NAME | OBJ | JOB CLASS CODE / TITLE | POSITION NUMBER | PERCENT EFFORT | BEGIN DATE END DATE | TOTAL AMOUNT FOR PERIOD SPECIFIED | MONTHLY OR HOURLY RATE | EARN TYPE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

---

## NEW APPOINTMENT DATA

| TOTAL FTE: 50 | HOURLY WAGE: | SHIFT: 10% ___ FLAT $ ___ | MONTHLY SALARY: 5000.00 | F-T ACADEMIC BASE: (9 Month Base) 90000.00 | F-T ANNUAL BASE (12 Month Base) |

| ACCOUNT NUMBER / NAME | OBJ | JOB CLASS CODE / TITLE | POSITION NUMBER | PERCENT EFFORT | BEGIN DATE END DATE | TOTAL AMOUNT FOR PERIOD SPECIFIED | MONTHLY OR HOURLY RATE | EARN TYPE |
|---|---|---|---|---|---|---|---|---|
| 0074-44-0231 Business Administration | | 030328 Research Associate | | 50 | 5/1/00 8/31/00 | 20000.00 | 5000.00 | RGS |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

---

| Optional Department Signatures: | Department Signature ___ Date 4/30/00 | Dean or Other Administrator ___ 5-1-00 Date | Personnel / Director Human Resources ___ Date |

EXHIBIT G

JW-000042

# FACULTY/STAFF - NO BUDGETED FALL APPOINTMENT
## FALL 2000 TURNAROUND DOCUMENT

| WETHERBE, JAMES COLAND        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 | REAPPOINTMENT/REVISION | SEPARATION FROM TECH |
|---|---|---|
| Job Title:  030328 - RESEARCH ASSOC PROF | Benefit Eligible? (R) __x__ Yes ____No | Separation Effective: _____ |
| Home Dept: BAB05 - BUSINESS ADMINISTRATION | Total FTE: __50__ | Separation Reason: _____ |
| Total FTE: 0.500 | Total Monthly Salary: 6666.67 | Base Salary (Personnel Use): _____ |
| CTZN/Visa: A1 | College Work Study?____ Yes _x_ No | |

Instructions: Copy the signed form for your records and deliver the colored original to the TTU Personnel Office, Drane 153.

| Preparer's Name: Cindy Ontiveros |
|---|
| Phone/Mailstop: 2-1552/2101 |

Explain: _____

## CURRENT FUNDING INFORMATION

| Account | Obj | Jobclass | Sup | Pct Eff | Begin Date | End Date | Full Time Base | Tot Amt Prd Specified | Monthly Rate | Earn Type | Payroll Use |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0074-44-0231 | 01 | 030328 | | 50.000 | 05/01/2000 | 08/31/2000 | 120,000.00 | 20,000.00 | 5,000.00 | RGS | |

## FALL 2000 APPOINTMENT INFORMATION

| Account | Obj | Jobclass | Sup | Pct Eff | Begin Date | End Date | Full Time Base | Tot Amt Prd Specified | Monthly Rate | Earn Type | Payroll Use |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0070-44-0232 | | 030310 | | 50 | 9/1/00 | 5/31/01 | 120000.00 | 60000.00 | 6666.67 | RGS | |

| Department _____ Date | Dean or Other Administrator _____ 8/1/00 Date | Personnel Director _____ Date |
|---|---|---|
| Next Level of Management _____ 8/1/00 Date | Divisional VP/Provost _____ Date | President _____ Date |

JW-000043

EXHIBIT G

DEPARTMENT COPY

# TEXAS TECH UNIVERSITY
## TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER
### NOTICE OF BUDGETED SALARY
#### 09/01/2001

NAME: **WETHERBE,JAMES COLAND**          SSN: **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**

HOME DEPARTMENT: **BAB05**      BUSINESS ADMINISTRATION

PRIMARY JOBTITLE: **030310**      PROFESSOR

SALARY/MONTH: **6,933.33**      TOTAL % EFFORT: **100.00**

FULL TIME BASE SALARY

ACADEMIC: **62,400.00**

ADMIN/P&A/CLASS: _____

**FUNDING INFORMATION

| ACCOUNT NUMBER | OBJ | JOB CLASS | POSITION NUMBER | SUP TYP | BUDGET FTE | PCT EFFORT | APPOINTMENT BEG DATE | APPOINTMENT END DATE | FULL TIME BASE | TOTAL AMT FOR PERIOD SPECIFIED | MONTHLY RATE | EARNINGS TYPE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0070-44-0232 | 01 | 030310 | 00524 | | 1.000000 | 100.0000 | 09/01/2001 | 05/31/2002 | 62,400.00 | 62,400.00 | 6,933.33 | RGS |

TOTAL SALARY:      62,400.00

JW-000044

PRINT DATE: 08/06/2001          EXHIBIT G          PAGE:      DEP-844

DEPARTMENT COPY

# TEXAS TECH UNIVERSITY
# TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER
## NOTICE OF BUDGETED SALARY
## 09/01/2002

**NAME:** WETHERBE,JAMES COLAND          **SSN:** 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

**HOME DEPARTMENT:** BAB05     BUSINESS ADMINISTRATION

**PRIMARY JOBTITLE:** 030310     PROFESSOR

**SALARY/MONTH:** 6,933.33     **TOTAL % EFFORT:** 50.00

**FULL TIME BASE SALARY**

**ACADEMIC:** 124,800.00

**ADMIN/P&A/CLASS:**

**\*\*FUNDING INFORMATION**

| ACCOUNT NUMBER | OBJ | JOB CLASS | POSITION NUMBER | SUP TYP | BUDGET FTE | PCT EFFORT | APPOINTMENT BEG DATE | APPOINTMENT END DATE | FULL TIME BASE | TOTAL AMT FOR PERIOD SPECIFIED | MONTHLY RATE | EARNINGS TYPE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0070-44-0232 | 01 | 030310 | 0000524 | | 0.500000 | 50.0000 | 09/01/2002 | 05/31/2003 | 124,800.00 | 62,400.00 | 6,933.33 | RGS |
| | | | | | | | | TOTAL SALARY: | | 62,400.00 | | |

**\*\*This notice does not constitute an offer or contract of employment for any period of time and it does not modify at-will employment relationships. Continued employment is contingent upon future receipt of funds.**

PRINT DATE:  08/03/2002

EXHIBIT G

PAGE:

JW-000045
DEP-905

# TEXAS TECH UNIVERSITY
# TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER
### NOTICE OF BUDGETED SALARY
#### 09/01/2003

DEPARTMENT COPY

**NAME:** WETHERBE,JAMES COLAND     **SSN:** 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

**HOME DEPARTMENT:** BAB05     BUSINESS ADMINISTRATION

**PRIMARY JOBTITLE:** 030310     PROFESSOR

**SALARY MONTH:** 6,933.33     **TOTAL % EFFORT** 50.00

**FULL TIME BASE SALARY**

**ACADEMIC:** 124,800.00

**ADMIN/P&A/CLASS:**

**\*\*FUNDING INFORMATION**

| ACCOUNT NUMBER | OBJ | JOB CLASS | POSITION NUMBER | SUP TYP | BUDGET FTE | PCT EFFORT | APPOINTMENT BEG DATE | APPOINTMENT END DATE | FULL TIME BASE | TOTAL AMT FOR PERIOD SPECIFIED | MONTHLY RATE | EARNINGS TYPE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0070-44-0232 | 01 | 030310 | 0000524 | | 0.500000 | 50.0000 | 09/01/2003 | 05/31/2004 | 124,800.00 | 62,400.00 | 6,933.33 | RGS |
| | | | | | | | | | | 62,400.00 | | |

\*\* This notice does not constitute an offer or contract of employment for any period of time and it does not modify at-will employment relationships.  Continued employment is contingent upon future receipt of funds.
PRINT DATE: 08/09/2003

JW-000046
DEP-1024

EXHIBIT G

# TEXAS TECH UNIVERSITY
## TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER
### NOTICE OF BUDGETED SALARY

DEPARTMENT COPY

#### 09/01/2004

NAME: **WETHERBE,JAMES COLAND**          SSN:  **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**

HOME DEPARTMENT: BAB05        BUSINESS ADMINISTRATION

PRIMARY JOBTITLE: 030310        PROFESSOR

SALARY MONTH:        6,933.33    TOTAL % EFFORT    50.00

FULL TIME BASE SALARY

ACADEMIC:        124,800.00

ADMIN/P&A/CLASS:

**FUNDING INFORMATION**

| ACCOUNT NUMBER | OBJ | JOB CLASS | POSITION NUMBER | SUP TYP | BUDGET FTE | PCT EFFORT | APPOINTMENT BEG DATE | APPOINTMENT END DATE | FULL TIME BASE | TOTAL AMT FOR PERIOD SPECIFIED | MONTHLY RATE | EARNINGS TYPE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0070-44-0232 | 01 | 030310 | 0080524 | | 0.500000 | 50.0000 | 09/01/2004 | 05/31/2005 | 124,800.00 | 62,400.00 | 6,933.33 | RGS |
| | | | | | | | | | | 62,400.00 | | |

** This notice does not constitute an offer or contract of employment for any period of time and it does not modify at-will employment relationships. Continued employment is contingent upon future receipt of funds.
PRINT DATE: 08-09-2004

DEF-110S

JW-000047

EXHIBIT G

EMPLOYEE COPY

# TEXAS TECH UNIVERSITY
# TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER
### NOTICE OF BUDGETED SALARY
### 09/01/2005

NAME: __WETHERBE,JAMES COLAND__          SSN: ___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___

HOME DEPARTMENT: BAB05          BUSINESS ADMINISTRATION

PRIMARY JOBTITLE: 030310          PROFESSOR

TOTAL % EFFORT: ___50.00___

**\*\*FUNDING INFORMATION**

| ACCOUNT NUMBER | OBJ | JOB CLASS | POSITION NUMBER | SUP TYP | BUDGET FTE | PCT EFFORT | APPOINTMENT BEG DATE | APPOINTMENT END DATE | FULL TIME BASE | SALARY AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 0070-44-0232 | 01 | 030310 | 0000524 | | 0.500000 | 50.0000 | 09/01/2005 | 05/31/2006 | 126,800.00 | 63,400.00 |
| | | | | | | | | TOTAL SALARY: | | 63,400.00 |

\*\* This notice does not constitute an offer or contract of employment for any period of time and it does not modify at-will employment relationships. Continued employment is contingent upon future receipt of funds.
PRINT DATE: 08/04/2005

EXHIBIT G

# Texas Tech University System

Personnel Actions Form

52210

WETHERBE, JAMES COLAND

Suffix:          Prefix:          Printdate/time: Thursday, September 07, 2006 7:54 AM
Trans #: 16164              Prepared: 8/30/2006 8:59:00 AM     Originator: Cindy Ontiveros

| Effective Date: 9/1/2006 | Actions: 17 Reappointment | | |
|---|---|---|---|
| Employment Status: | Separation Reason: | Annual FTB: | |
| Benefit Eligible: Yes | Shift Type: | Hrly Rate + Shift: 0 | |
| Home Department: | Address/MS: | | |
| Extended Title: | County: | Housing Code: | |
| Supervisor TechID: 42059 HOFFMAN, JAMES J | Requisition: [Blank]   Replacement for: | | New Position: |
| Leave Reason: | Last Day Worked: | Leave End Date: | |
| Last Date Paid: | Tenured: | | |

## NEW APPOINTMENTS

Empl FTE: 0.500   Max Hourly Rate: 0    Total Monthly Salary: 7044.44    F-T Academic(9 mo) Base: $126,800.00  F-T Annual(12 mo) Base: $0.00

Explanation Area: [0070440232:9/1/2006-5/31/2007:$63,399.96];

| Account | Obj | JobClass | Bgt Posn# | SUP | Bgt Temp | IndBgt Percent Effort | Begin Date End Date | Total Amt for Period | Hrly/Mth Rate | Earn Type | Budget/Payroll Use |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0070-44-0232 | 01 | 030310 | 0000524 | | P | 50.000 | 9/1/2006 | 63399.96 | 7044.44 | RGS | |
| BAB05 BUS ADMIN | | PROFESSOR | | | | | 5/31/2007 | | | | |

EXHIBIT G

JW-000049

# Texas Tech
# University System
Personnel Actions Form

**WETHERBE, JAMES COLAND**

| | | |
|---|---|---|
| Suffix: | Prefix: | Printdate/time: Friday, August 31, 2007 6:51 AM |
| Trans #: 59214 | Prepared: 8/23/2007 10:45:00 AM | Originator: Cindy Ontiveros |

| Effective Date: 9/1/2007 | Actions: 17 Reappointment | 20 Equity Increase | 18 Supervisor Change |
|---|---|---|---|

| | | |
|---|---|---|
| Employment Status: | Separation Reason: | Annual FTB: |
| Benefit Eligible: Yes | Shift Type: | Hrly Rate + Shift: 0 |
| Home Department: | Address/MS: | |
| Extended Title: | County: | Housing Code: |
| Supervisor TechID: 58276 MCINNES, ALLEN | Requisition: [Blank]   Replacement for: | New Position: |
| Leave Reason: | Last Day Worked: | Leave End Date: |
| Last Date Paid: | Tenured: | |

## NEW APPOINTMENTS

Empl FTE: 0.500   Max Hourly Rate: 0   Total Monthly Salary: 7722.23   F-T Academic(9 mo) Base: $139,000.00   F-T Annual(12 mo) Base: $0.00

Explanation Area: APPT056: Informational: Annual salary increased/decreased by 6.42%.; APPT021: Warning: Annual salary has increased by $8396.00 for Full-Time Base of $139000.00.; [0070440232:9/1/2007-5/31/2008:$69,500.07] [0074440231:9/1/2007-5/31/2008:$10,500.03] [1506449305:9/1/2007-5/31/2008:$30,000.06];

| Account | Obj | JobClass | Bgt Posn# | SUP | Bgt Temp | IndBgt Percent Effort | Begin Date End Date | Total Amt for Period | Hrly/Mth Rate | Earn Type | Budget/Payroll Use |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0070-44-0232 | 01 | 030310 | | | P | 50.0000 | 9/1/2007 | 69500.07 | 7722.23 | RGS | |
| BAB05 BUS ADMIN | | PROFESSOR | | | | | 5/31/2008 | | | | |
| 0074-44-0231 | 01 | 030310 | | S | P | 0.0000 | 9/1/2007 | 10500.03 | 1166.67 | SSR | |
| BAB05 BUS ADMIN | | PROFESSOR | | | | | 5/31/2008 | | | | |
| 1506-44-9305 | 01 | 030310 | | A | P | 0.0000 | 9/1/2007 | 30000.06 | 3333.34 | SSR | |
| BAB05 BUS ADMIN | | PROFESSOR | | | | | 5/31/2008 | | | | |

# Appointment History Report

Wetherbe, James C.   |   Show JLBD

This report is a summary of SALARY APPOINTMENTS only. The salary information presented in this report is the approved or budgeted salary for each employee. In some circumstances (such as Leave Without Pay, Labor Redistributions), the actual amount paid may differ from the salary appointments shown in this report.  NOTE: IF this report "locks up" when you are trying to generate the report, try the following.  Select another employee and run the report, it will usually run.  Then go back and run the report for the employee you were originally trying to retrieve information on.  Sometimes running a different report and then coming back to this report helps as well.

## Current Employee Information

| Employee ID | Employee Name | Employee Status | Current Hire Date | Original Hire Date | E Class | E Class Desc | FUI/Part Time | Hiring Location | Hiring Location Desc | COAS | Home ORGN | Home ORGN Desc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R00905892 | Wetherbe, James C. | A | 05/01/2000 | 05/01/2000 | F1 | FT 9 Mo Fac Non Vac Elig | F | | | T | B54000 | Rawls College of Business |

## Job Information

| Position Number | Position Title | Job Suffix | Effective | Eff Start Date | Eff End Date | Change Reason | Status | Position ORGN | Position ORGN Desc | Payroll ID | Job Type | FTE | Hourly Rate | Hours/ Units per Pay | Assign Salary Per Pay Period | Factor | Pay Periods | Annual Salary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| T98183 | Professor | 00 | Past | 09/01/2008 | 05/31/2009 | Conversion | A | B54000 | Rawls College of Business | MN | Secondary | 0.000 | 4,500.00 | 1.00 | $4,500.00 | 9 | 9 | $40,500.00 |
| T98245 | Professor | 00 | Current | 03/01/2012 | 12/31/2099 | Merit Increase | A | B54000 | Rawls College of Business | MN | Primary | 1.000 | 146.46 | 173.33 | $25,386.67 | 9 | 12 | $228,480.00 |
| | Professor | | Past | 02/01/2012 | 03/01/2012 | Merit Increase | A | B54000 | Rawls College of Business | MN | Primary | 1.000 | 146.46 | 173.33 | $25,386.67 | 9 | 12 | $228,480.00 |
| | Professor | | Past | 09/01/2011 | 02/01/2012 | New FY Appointment | A | B54000 | Rawls College of Business | MN | Primary | 1.000 | 143.59 | 173.33 | $24,888.89 | 9 | 12 | $224,000.00 |
| | Professor | | Past | 09/01/2010 | 09/01/2011 | New FY Appointment | A | B54000 | Rawls College of Business | MN | Primary | 1.000 | 143.59 | 173.33 | $24,888.89 | 9 | 12 | $224,000.00 |
| | Professor | | Past | 08/01/2010 | 09/01/2010 | Reappointment | A | B54000 | Rawls College of Business | MN | Primary | 1.000 | 143.59 | 173.33 | $24,888.89 | 9 | 12 | $224,000.00 |
| | Professor | | Past | 09/01/2009 | 08/01/2010 | Merit Increase | A | B54000 | Rawls College of Business | MN | Primary | 1.000 | 143.59 | 173.33 | $24,888.89 | 9 | 12 | $224,000.00 |
| | Professor | | Past | 09/01/2008 | 09/01/2009 | Conversion | A | B54000 | Rawls College of Business | MN | Primary | 0.500 | 90.88 | 86.67 | $7,876.67 | 9 | 9 | $70,890.03 |
| | Professor | 10 | Past | 07/01/2011 | 08/31/2011 | Add Secondary Job | A | B54000 | Rawls College of Business | MN | Secondary | 0.723 | 143.63 | 125.32 | $18,000.00 | 9 | 9 | $162,000.00 |
| | Professor | | Past | 06/01/2011 | 06/30/2011 | Add Secondary Job | A | B54000 | Rawls College of Business | MN | Secondary | 1.000 | 28.85 | 173.33 | $5,000.00 | 9 | 9 | $45,000.00 |
| | Professor | L1 | Past | 09/01/2011 | 11/30/2011 | Overload Job | A | B54000 | Rawls College of Business | MN | Overload | 0.000 | 6,000.00 | 1.00 | $6,000.00 | 9 | 9 | $54,000.00 |
| | Professor | | Past | 09/01/2010 | 11/30/2010 | Overload Job | A | B54000 | Rawls College of Business | MN | Overload | 0.000 | 6,000.00 | 1.00 | $6,000.00 | 9 | 9 | $54,000.00 |

## Job Labor Distribution

| Position Number | Position Title | Job Suffix | Effective | Eff Start Date | Eff End Date | Status | COAS | FUND | FUND Desc | ORGN | ORGN Desc | ACCT | ACCT Desc | PROG | Amount Pay per Period | Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| T98183 | Professor | 00 | Past | 09/01/2008 | 12/31/2099 | A | T | 11A006 | Departmental Operating Expense | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 100 | $1,166.40 | 25.92% |
| T98183 | Professor | 00 | | 09/01/2008 | 12/31/2099 | A | T | 24A579 | Business Administration Cost of Ed | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 400 | $3,333.60 | 74.08% |
| | | | | | | | | | | | | | Past Dated Record(s) Effective (09/01/2008 - 12/31/2099) | | $4,500.00 | 100.00% |
| T98245 | Professor | 00 | Current | 09/01/2011 | 12/31/2099 | A | T | 16D294 | Rawls College Grad Enhancement Fee | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 100 | $6,801.09 | 26.79% |
| T98245 | Professor | 00 | | 09/01/2011 | 12/31/2099 | A | T | 24D564 | Bobby G Stevenson IT End Chair | B54005 | ISQS | 6A1802 | SW Faculty Tenure Track | 200 | $3,401.61 | 13.40% |
| T98245 | Professor | 00 | | 09/01/2011 | 12/31/2099 | A | T | 16H001 | Rawls Executive Styled MBA | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 400 | $11,556.17 | 45.56% |
| T98245 | Professor | 00 | | 09/01/2011 | 12/31/2099 | A | T | 11A004 | Faculty Salaries | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 200 | $903.77 | 3.56% |
| T98245 | Professor | 00 | | 09/01/2011 | 12/31/2099 | A | T | 11A004 | Faculty Salaries | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 100 | $2,713.83 | 10.69% |
| | | | | | | | | | | | | | Current Dated Record(s) Effective (09/01/2011 - 12/31/2099) | | $25,386.67 | 100.00% |
| T98245 | Professor | 00 | Past | 09/01/2011 | 12/31/2099 | A | T | 16D294 | Rawls College Grad Enhancement Fee | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 100 | $6,667.73 | 26.79% |
| T98245 | Professor | 00 | | 09/01/2011 | 12/31/2099 | A | T | 16D294 | Rawls College Grad Enhancement Fee | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 100 | $6,801.09 | 26.79% |

↓ Drill Down

User - Kim Brannan
May 8, 2012 1:04 PM

Report - Budget > Budget Human Resources Reports > RPT_NBAJOBS_011 - Appointment History Report
Package - A_BUD_BUDGET_HUMAN_RESOURCESBudget > Budget Human Resources Reports >
1 of 3

Last Modified
May 4, 2012 8:28 AM

EXHIBIT G

JW-000051

# Appointment History Report

Wetherbe, James C.   |   Show JLBD

This report is a summary of SALARY APPOINTMENTS only. The salary information presented in this report is the approved or budgeted salary for each employee. In some circumstances (such as Leave Without Pay, Labor Redistributions), the actual amount paid may differ from the salary appointments shown in this report. NOTE: IF this report "locks up" when you are trying to generate the report, try the following. Select another employee and run the report, it will usually run. Then go back and run the report for the employee you were originally trying to retrieve information on. Sometimes running a different report and then coming back to this report helps as well.

| Position Number | Position Title | Job Suffix | Effective | Eff Start Date | Eff End Date | Status | COAS | FUND | FUND Desc | ORGN | ORGN Desc | ACCT | ACCT Desc | PROG | Amount Pay per Period | Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Past | | | | | | Fee | | | | | | | |
| T98245 | Professor | 00 | | 09/01/2011 | 12/31/2099 | A | T | 24D564 | Bobby G Stevenson IT End Chair | B54005 | ISQS | 6A1802 | SW Faculty Tenure Track | 200 | $3,401.81 | 13.40% |
| T98245 | Professor | 00 | | 09/01/2011 | 12/31/2099 | A | T | 24D564 | Bobby G Stevenson IT End Chair | B54005 | ISQS | 6A1802 | SW Faculty Tenure Track | 200 | $3,335.11 | 13.40% |
| T98245 | Professor | 00 | | 09/01/2011 | 12/31/2099 | A | T | 16H001 | Rawls Executive Styled MBA | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 400 | $11,566.17 | 45.56% |
| T98245 | Professor | 00 | | 09/01/2011 | 12/31/2099 | A | T | 16H001 | Rawls Executive Styled MBA | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 400 | $11,339.38 | 45.56% |
| T98245 | Professor | 00 | | 09/01/2011 | 12/31/2099 | A | T | 11A004 | Faculty Salaries | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 200 | $903.77 | 3.56% |
| T98245 | Professor | 00 | | 09/01/2011 | 12/31/2099 | A | T | 11A004 | Faculty Salaries | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 200 | $886.04 | 3.56% |
| T98245 | Professor | 00 | | 09/01/2011 | 12/31/2099 | A | T | 11A004 | Faculty Salaries | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 100 | $2,713.83 | 10.69% |
| T98245 | Professor | 00 | | 09/01/2011 | 12/31/2099 | A | T | 11A004 | Faculty Salaries | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 100 | $2,660.62 | 10.69% |
| | | | | | | | | | | | | Past Dated Record(s) Effective (09/01/2011 - 12/31/2099) | | | $50,275.56 | 100.00% |
| T98245 | Professor | 00 | Past | 09/01/2010 | 08/31/2011 | A | T | 11A004 | Faculty Salaries | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 200 | $886.04 | 3.56% |
| T98245 | Professor | 00 | | 09/01/2010 | 08/31/2011 | A | T | 24D564 | Bobby G Stevenson IT End Chair | B54005 | ISQS | 6A1802 | SW Faculty Tenure Track | 200 | $3,335.11 | 13.40% |
| T98245 | Professor | 00 | | 09/01/2010 | 08/31/2011 | A | T | 16G028 | Center for Professional Development | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 300 | $18,007.11 | 72.35% |
| T98245 | Professor | 00 | | 09/01/2010 | 08/31/2011 | A | T | 11A004 | Faculty Salaries | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 100 | $2,660.62 | 10.69% |
| | | | | | | | | | | | | Past Dated Record(s) Effective (09/01/2010 - 08/31/2011) | | | $24,888.89 | 100.00% |
| T98245 | Professor | 00 | Past | 08/01/2010 | 08/31/2010 | A | T | 11A004 | Faculty Salaries | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 100 | $2,660.62 | 10.69% |
| T98245 | Professor | 00 | | 08/01/2010 | 08/31/2010 | A | T | 11A004 | Faculty Salaries | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 200 | $886.04 | 3.56% |
| T98245 | Professor | 00 | | 08/01/2010 | 08/31/2010 | A | T | 24D564 | Bobby G Stevenson IT End Chair | B54005 | ISQS | 6A1802 | SW Faculty Tenure Track | 200 | $3,335.11 | 13.40% |
| T98245 | Professor | 00 | | 08/01/2010 | 08/31/2010 | A | T | 16G028 | Center for Professional Development | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 300 | $18,007.11 | 72.35% |
| | | | | | | | | | | | | Past Dated Record(s) Effective (08/01/2010 - 08/31/2010) | | | $24,888.89 | 100.00% |
| T98245 | Professor | 00 | Past | 10/01/2009 | 07/31/2010 | A | T | 11A004 | Faculty Salaries | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 100 | $2,660.62 | 10.69% |
| T98245 | Professor | 00 | | 10/01/2009 | 07/31/2010 | A | T | 24A579 | Business Administration Cost of Ed | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 200 | $833.78 | 3.35% |
| T98245 | Professor | 00 | | 10/01/2009 | 07/31/2010 | A | T | 11A004 | Faculty Salaries | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 200 | $886.04 | 3.56% |
| T98245 | Professor | 00 | | 10/01/2009 | 07/31/2010 | A | T | 24A579 | Business Administration Cost of Ed | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 400 | $2,501.33 | 10.05% |
| T98245 | Professor | 00 | | 10/01/2009 | 07/31/2010 | A | T | 16G028 | Center for Professional Development | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 200 | $4,502.40 | 18.09% |
| T98245 | Professor | 00 | | 10/01/2009 | 07/31/2010 | A | T | 16G028 | Center for Professional Development | B54000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 300 | $13,504.71 | 54.26% |

User - Kim Brannan
May 8, 2012 1:04 PM

± Drill Down
Report - Budget > Budget Human Resources Reports > RPT_NBAJOBS_011 - Appointment History Report
Package - A_BUD_BUDGET_HUMAN_RESOURCESBudget > Budget Human Resources Reports >
2 of 3

Last Modified
May 4, 2012 8:28 AM

EXHIBIT G

JW-000052

# Appointment History Report

Wetherbe, James C.   |   Show JLBD

This report is a summary of SALARY APPOINTMENTS only. The salary information presented in this report is the approved or budgeted salary for each employee. In some circumstances (such as Leave Without Pay, Labor Redistributions), the actual amount paid may differ from the salary appointments shown in this report.  NOTE: IF this report "locks up" when you are trying to generate the report, try the following.  Select another employee and run the report, it will usually run.  Then go back and run the report for the employee you were originally trying to retrieve information on.  Sometimes running a different report and then coming back to this report helps as well.

| Position Number | Position Title | Job Suffix | Effective | Eff Start Date | Eff End Date | Status | COAS | FUND | FUND Desc | ORGN | ORGN Desc | ACCT | ACCT Desc | PROG | Amount Pay per Period | Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | Past Dated Record(s) Effective (10/01/2009 - 07/31/2010) | $24,888.89 | 100.00% |
| T98245 | Professor | 00 | Past | 09/01/2009 | 09/30/2009 | A | T | 11A004 | Faculty Salaries | 854000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 100 | $3,546.67 | 14.25% |
| T98245 | Professor | 00 | | 09/01/2009 | 09/30/2009 | A | T | 16G028 | Center for Professional Development | 854000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 300 | $18,007.11 | 72.35% |
| T98245 | Professor | 00 | | 09/01/2009 | 09/30/2009 | A | T | 24A579 | Business Administration Cost of Ed | 854000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 400 | $3,335.11 | 13.40% |
| | | | | | | | | | | | | | | | Past Dated Record(s) Effective (09/01/2009 - 09/30/2009) | $24,888.89 | 100.00% |
| T98245 | Professor | 00 | Past | 09/01/2008 | 08/31/2009 | A | T | 11A004 | Faculty Salaries | 854000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 100 | $7,876.67 | 100.00% |
| | | | | | | | | | | | | | | | Past Dated Record(s) Effective (09/01/2008 - 08/31/2009) | $7,876.67 | 100.00% |
| T98245 | Professor | 10 | Past | 07/01/2011 | 12/31/2099 | A | T | 16D308 | Rawls Executive Styled MBA | 854000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 100 | $18,000.00 | 100.00% |
| | | | | | | | | | | | | | | | Past Dated Record(s) Effective (07/01/2011 - 12/31/2099) | $18,000.00 | 100.00% |
| T98245 | Professor | 10 | Past | 06/01/2011 | 06/30/2011 | A | T | 24G327 | Internet Buyer Behavior Research | 854000 | Rawls College of Business | 6A1803 | SW Fac Tenure Trk 9 Mo Summ Res | 200 | $5,000.00 | 100.00% |
| | | | | | | | | | | | | | | | Past Dated Record(s) Effective (06/01/2011 - 06/30/2011) | $5,000.00 | 100.00% |
| T98245 | Professor | L1 | Past | 09/01/2011 | 12/31/2099 | A | T | 16H001 | Rawls Executive Styled MBA | 854000 | Rawls College of Business | 6A2011 | SW Additional Compensation | 100 | $6,000.00 | 100.00% |
| | | | | | | | | | | | | | | | Past Dated Record(s) Effective (09/01/2011 - 12/31/2099) | $6,000.00 | 100.00% |
| T98245 | Professor | L1 | Past | 09/01/2010 | 08/31/2011 | A | T | 16G007 | Texas Center CPD Confs and Seminars | 854000 | Rawls College of Business | 6A1802 | SW Faculty Tenure Track | 300 | $6,000.00 | 100.00% |
| | | | | | | | | | | | | | | | Past Dated Record(s) Effective (09/01/2010 - 08/31/2011) | $6,000.00 | 100.00% |

User - Kim Brennan
May 8, 2012 1:04 PM

± Drill Down
Report - Budget > Budget Human Resources Reports > RPT_NBAJCBS_011 - Appointment History Report
Package - A_BUD_BUDGET_HUMAN_RESOURCESBudget > Budget Human Resources Reports >
3 of 3

Last Modified
May 4, 2012 9:28 AM

EXHIBIT G

JW-000053



TEXAS TECH UNIVERSITY
Rawls College *of* Business

Dean's Office

Mr. Bobby Stevenson
5251 DTC Parkway, Suite 285
Greenwood Village, CO 80111

November 30, 2010

Dear Bobby,

An update on my usage of the funds generated by your generous gift:

I am continuing to support my work as the chair holder and continue to relinquish taking full salary from the earnings from the chair endowment. Eric Walden holds the first Wetherbe professorship created by the unspent yearly earnings. The second Wetherbe professorship is currently held by Don Jones.

With your previous permission, I have continued to support the college with the unused yearly proceeds of the chair endowment.

If you continue to agree to this, please sign this letter below, and return in the enclosed FedEx package addressed to the Rawls College of Business, attn: Randi Rivers, 15th and Flint, Lubbock, TX 79409-2101.

Sincerely,

Jim Wetherbe
Stevenson Chaired Professor in MIS

As the second professorship has been established, per the previous agreement of October 5, 2004, I agree to allow the non-expended funds from the chair I have established to be used to support the new Rawls College of Business building up to $600,000. In addition, I agree that that Professor Wetherbe's support be in the Wetherbe Family name, as he prefers, for naming purposes. After the building support is completed, Professor Wetherbe can use the revenue from the endowment to add to, or create new, Wetherbe professorships.

Bobby Stevenson                                        12-2-10

Bobby Stevenson                                        Date

Box 42101 | Lubbock, Texas 79409-2101 | T 806.742.3188 | F 806.742.1092

An EEO/Affirmative Action Institution                EXHIBIT H                JW-000040

[Minor revision–posted 2/4/10]

**TEXAS TECH UNIVERSITY**

Operating Policy and Procedure

**OP 32.09:**     **Selection of Paul Whitfield Horn Professorships**

**DATE:**     February 4, 2010

**PURPOSE:**     The purpose of this Operating Policy/Procedure (OP) is to ensure understanding and a standardized approach in the handling of special professorships.

**REVIEW:**     This OP will be reviewed in October of odd-numbered years by the provost and senior vice president (PSVP).

**POLICY/PROCEDURE**

1. **Horn Professorships**
   **\* Section 04.01.1, *Regents' Rules***

   a.   The Board of Regents establishes special professorships known as "Paul Whitfield Horn Professorships," named in honor of Paul Whitfield Horn, the first president of the institution (hereafter referred to as Horn Professorships).

   b.   Horn Professorships, the highest honor that the university may bestow on members of its faculty, are granted to professors in recognition of their attainment of national and/or international distinction for outstanding research or other creative, scholarly achievement.

   c.   The Board of Regents shall approve those faculty members to be granted Horn Professorships upon recommendation by the president.

   d.   The salary of an appointee to a Horn Professorship shall be supplemented and a discretionary account will be created. This account, when initially funded, will receive one-half of the allotted amount for the current year and then the full amount at the beginning of the next fiscal year. Upon retirement, one additional year of funding for the discretionary account will be made to allow ongoing projects or student support to be completed. Funds are allocated for the named Horn Professor and are for his or her use only. One year past retirement, or in the case of death of the Horn Professor, the remaining fund balance will revert to the university.

   e.   The number of Horn Professorships shall not be limited to a fixed quota, nor shall an effort be made to maintain fixed ratios of this special position among colleges and departments.

   f.   Horn Professors shall serve, individually and as a body, in an advisory capacity to the president and the PSVP on matters of importance to the university and related to furthering the national and international reputation of Texas Tech University.

2. **Nomination Procedure**

   a.   The nomination of a professor for the designation "Horn Professor" is made by a department chair, Horn Professor, or dean. Nominations from department chairs and Horn Professors should be forwarded to the dean of the college in which the nominee holds professorial status.

EXHIBIT I

In the case of faculty who hold appointments split between more than one college, the dean of either college may oversee the nomination and evaluation process. Self-nominations are not allowed. Nominees not selected may be re-nominated without prejudice.

b.   The dean of each college shall appoint a committee to evaluate nominees from the college. The committees shall consist of at least three distinguished members of the Texas Tech faculty holding the rank of professor, one of whom must be a Horn Professor. Those eligible for selection to this committee need not be in the same college as the nominee. The nominee shall be notified of her/his nomination and approve the preparation of her/his nomination dossier. The nominee must submit a list (to include electronic addresses) of 20 names of prominent scholars or other persons qualified to evaluate the nominee's professional qualifications and suitability for award of a Horn Professorship. From this list, the dean must obtain a minimum of three external letters of evaluation and shall make these letters available to the college evaluation committee. Examples of supporting evidence for selection as a Horn Professor and the nominee's complete dossier shall be provided to each individual who is asked to submit an evaluation letter. The college evaluation committee votes anonymously and the votes are recorded on a ballot sheet (see attachment), which becomes part of the nomination dossier. Voters may submit anonymous comments separate from the ballots. If the dean supports the nomination, s/he writes a letter of recommendation indicating her/his support of the nomination. With the concurrence of the nominee, the nomination dossiers supported by the dean are forwarded to the PSVP with the dean's letter, ballot sheet, and external letters for further evaluation. From the list of 20 names provided by the nominee, the PSVP will solicit 15 additional evaluation letters. The dean will bring to the attention of the PSVP any deviation from objective consideration of the nominee, as outlined in this OP.

c.   The committee, comprised of the PSVP, five or more Horn Professors, and the holder of an endowed chair or professorship appointed by the PSVP, will review the nominations. The president of the Faculty Senate shall serve as a non-voting observer of the selection process. The committee will meet as a group to discuss the nominees in depth and in confidentiality. The committee will vote anonymously and the votes will be recorded on the ballot sheet. The PSVP will write a letter summarizing the recommendations of the committee and indicating her/his support or rejection of each nominee. The PSVP will forward the ballot sheets and recommendation letter to the president for concurrence. If the recommendation of the PSVP varies from the majority vote of the committee, the PSVP will communicate her/his recommendation in writing to the Horn Professors. The PSVP will meet with the president to review the recommendations and will bring to the attention of the president any deviation from objective consideration of the nominees, as outlined in this OP. The president will forward her/his recommendations to the Board of Regents. If the recommendation of the president varies from the majority vote of the PSVP's advisory committee, the president will communicate her/his recommendation in writing to the Horn Professors. The PSVP shall notify each nominee and her/his college dean of the status of the nomination. The status of the recommendations to the Board of Regents for faculty to receive this honor must otherwise remain confidential until the Board of Regents takes final action.

3.   **Eligibility and Criteria for Selection**

a.   Members of the faculty who hold the rank of dean or above are not eligible for nomination for a Horn Professorship. Horn Professors who are subsequently appointed as deans or to higher-ranking administrative positions shall retain their Horn Professorships.

b.   Effective teaching is a requirement for nomination for a Horn Professorship.

c.   The primary basis for selection for a Horn Professorship shall be the attainment of

EXHIBIT I

exceptional national and/or international distinction for outstanding research or other creative, scholarly achievement.

Examples listed below are representative of supporting evidence for a nominee's national or international distinction.

(1)   The publication of books, articles, reviews, works of art, and other evidence particular to the field of scholarly achievement. Publications shall be in scholarly journals or sources customary to the field of interest.

(2)   Awards and prizes from professional organizations and foundations

(3)   Grants in support of research, study, or creative works

(4)   Offices held in learned societies

(5)   Papers read before learned societies

(6)   Lectures or performances delivered at other academic, industrial, or professional venues

(7)   Services as expert, consultant, etc., to business, industry, governmental agencies, and educational organizations

d.   A significant portion of the nominee's achievements must have been carried out while the nominee was a member of the Texas Tech faculty to demonstrate continuing excellence in the attainment of national and/or international distinction for outstanding research or other creative, scholarly achievement.

Attachment: *Horn Professor Nomination Ballot*

_____

EXHIBIT I

August 2, 2011

Dear Dean McInnes,

I would like to nominate Professor and Associate Dean Jim Wetherbe for Horn Professor. Enclosed is supporting information to show he meets all of the criteria for Horn Professor as outlined in OP 32.09: Selection of Paul Whitfield Horn Professorships.

Jim joined our faculty as a full professor in Management Information Systems in 2000, although he was not new to the Texas Tech campus, having received his MBA in 1973 and PhD in 1976 in MIS from TTU. His resume (enclosed) points out that his present title is Associate Dean for Research and Development, and Director of the Institute for Internet Buyer Behavior and the Institute for Entrepreneurship and Technovation. He started up this institute with a $500,000 grant he got from Best Buy, where he was a Member of the Board. His resume lists numerous awards, including the TTU Distinguished Alumni Award in 2006.

In the research area Jim has distinguished himself nationally and internationally as the result of numerous books and papers. He has at least 4628 citations, as shown by a recent screen print (enclosed) of the software Harzing's Publish or Perish. Most of these citations are to papers he published in the MIS Quarterly, the leading publication in Management Information Systems.

As a teacher he has done an outstanding job of teaching communication skills to our MBA students. Note that many of his books are directed at how to communicate effectively, an area that many potential employers regard as most important. An example of his teaching popularity is enclosed as the rating he received in just one class, 9.56 out of 10, clearly the most favorite of the several professors in this weekend program. He has won several teaching awards.

Adding to his worldwide reputation is his talent as a keynote speaker. Enclosed is a list of 24 titles of popular presentations he gives, and testimonials from dozens of CEOs, presidents, vice presidents, and other leaders in industry around the world.

Finally, I am enclosing a list of 20 outstanding professionals in his field, and letters from a sample of these, filling in additional information that supports this nomination. I fully support this nomination and will be glad to assist in furthering it in any way I can.

Sincerely,

W. J. Conover
Horn Professor of Statistics

EXHIBIT J



TEXAS TECH UNIVERSITY
Rawls College *of* Business™

Dean's Office

Dr. Bob Smith, Provost
Office of the Provost
Texas Tech University
Mail Stop # 2019

October 3, 2011

Dear Bob,

It is my pleasure to nominate Dr. James Wetherbe for a Paul Whitfield Horn Professorship.

In 2001, Dr. Wetherbe was a key member of the search committee that recruited me from industry to become Dean of the Rawls College of Business at Texas Tech University. He well understands the role of Dean, and he works extremely well with faculty, staff, students, administration and alumni, achieving outstanding educational programs and excellence in research and outreach activities.

He is an alum of Texas Tech's PhD and MBA programs, and, after enjoying distinguished careers at the University of Houston, University of Minnesota and the University of Memphis, he was recruited to return to Texas Tech University in 2000 to give back to his alma mater. During this time he brought in a $500,000 research grant from Best Buy to establish and serve as the Director of the Institute for Internet Buyer Behavior thus generating a stream of research published in top journals. He has played a key role in redesigning our MBA program, and he has consistently received the highest teacher evaluations from both traditional and professional programs.  Also, as PhD coordinator, he has helped improve research and placement of doctoral students.

A key member of our administrative faculty, he has been most helpful to me in our successful fund raising efforts for a new college of business building – a $35 million campaign, consisting of donations made primarily from our friends and alumni, which will be matched by the university.

EXHIBIT K

Page 2
J.C. Wetherbe
Horn Nomination

In addition, Dr. Wetherbe has meaningful industry experience, including serving on the board of directors of several major companies, and he often serves as the keynote speaker at industry events.

I know Jim and understand well his skills, motivation and interest in serving Texas Tech University and its supporters. He is innovative and creative with exceptional interpersonal skills. I have no doubt he would be an extraordinary Horn Professor. I encourage you to give him serious consideration.

Please feel free to call on me should you desire additional information.


Best Regards,

Allen T. McInnes, PhD
Dean

EXHIBIT K

**Horn Professor Nomination Ballot**

Candidate: _WETHERBE_   _JAMES_   _C._
          Last Name      First Name      Middle Name

---

**College Committee**

(Recommends)   #Yes _3_  #No _0_  #Abstaining _0_

_(signature)_
(Chair's Signature)

---

**Dean of the College**

Recommends   Yes _✓_  No ___

_(signature)_
(Dean's Signature)

---

**Horn Selection Committee**   5 yes / 2 no

Recommends   #Yes _✓_  #No ____  #Abstaining _____

_Bob Smith_
(PSVP's Signature)

---

**Provost and Senior Vice President**

Recommends   Yes _✓_  No _____

_Bob Smith_
(PSVP's Signature)

---

**President**

Recommends   Yes _____  No _____

_____
(President's Signature)

Attachment
OP 32.09
2/4/10

Smith 0030

EXHIBIT L

**Conover, Jay**

| | |
|---|---|
| **From:** | Roberson, Pam |
| **Sent:** | Thursday, March 08, 2012 7:32 AM |
| **To:** | Estreicher, Stefan; Conover, Jay; Ruymgaart, H; Martin, Clyde F; Nathan, Daniel; Beruvides, Mario; Hendrick, S; Westfall, Peter; Roberson, Pam |
| **Subject:** | Horn Selection Committee Special Meeting |

The Provost has requested a follow up meeting with this committee. New information has come to light regarding one of the candidates. I will send through a meeting request to everyone's calendars. Thank you.

*Pam Roberson*
Executive Administrative Associate
Texas Tech University
Office of the Provost and Senior Vice President
Box 42019
Lubbock, TX 79409-2019
806-742-2184 (phone)
806-742-1331 (fax)

EXHIBIT M

### Horn Professor Nomination Ballot

Candidate: _WETHERBE_ _JAMES_ _C._
　　　　　　　Last Name　　　　First Name　　　　Middle Name

**College Committee**

(Recommends)   #Yes _3_   #No _0_   #Abstaining _0_

_____
(Chair's Signature)

**Dean of the College**

Recommends   Yes _✓_   No _____

_____
(Dean's Signature)

**Horn Selection Committee**      5 yes / 2 no

Recommends   #Yes _✓_   #No _____   #Abstaining _____

_____
(PSVP's Signature)

**Provost and Senior Vice President**   RVS MAR 2 7 2012

Recommends   Yes _✓_   No _✓_   RVS MAR 2 7 2012

_____
(PSVP's Signature)

**President**      GB      GB

Recommends   Yes _Ø_   No _✓_

_____
(President's Signature)

RECONSIDERED
BY R.V.
SMITH
ON
MAR 2 7 2012

I concur
with Dr. Smith
GB

Attachment
OP 32.09
2/4/10

Smith 0040

-----Original Message-----
From: Jim Wetherbe <jcwetherbe@aol.com<mailto:jcwetherbe@aol.com>>
Date: Tue, 29 May 2012 02:28:23 -0500
To: Texas Tech University <bob.smith@ttu.edu<mailto:bob.smith@ttu.edu>>
Cc: Rob Stewart <rob.stewart@ttu.edu<mailto:rob.stewart@ttu.edu>>
Subject: Status of Horn Professor Nomination

Dear Provost Smith:

The public agenda for the Board of Regents meeting on May 17-18, 2012,
contains a line item for "TTU: Approve designation of Horn Professorship."
As you know, my grievance requested that my nomination for the Horn
Professorship be moved forward as approved by the Rawls College of Business
and the Texas Tech Horn Professor committee.  If the recommendation of the
PSVP varies from the majority vote of the Horn committee, Section 2(c) of OP
32.09 requires the PSVP to communicate his recommendation in writing to the
Horn Professors.   The PSVP is required to meet with the President to review
the recommendations.   The president is required to forward his
recommendations to the Board of Regents.

If the recommendation of the president varies from the majority vote of the
PSVP's advisory committee, the president is required to communicate his
recommendation in writing to the Horn Professors.  Finally, OP 32.09 requires
the PSVP to notify each nominee and his college dean of the status of the
nomination.  Please let me know the status of my nomination.

Thank you.

Jim

James C. Wetherbe, PhD
Stevenson Chaired Professor of MIS
Associate Dean for Outreach
Rawls College of Business
Texas Tech University
505.250.9999
jcwetherbe@aol.commailto:jcwetherbe@aol.com

-----Original Message-----
From: Smith, Bob <bob.smith@ttu.edu<mailto:bob.smith@ttu.edu>>
To: Jim Wetherbe <jcwetherbe@aol.com<mailto:jcwetherbe@aol.com>>
Cc: Bailey, Guy <guy.bailey@ttu.edu<mailto:guy.bailey@ttu.edu>>; Stewart, Rob
<ROB.STEWART@ttu.edu<mailto:ROB.STEWART@ttu.edu>>; Mcinnes, Allen
<allen.mcinnes@ttu.edu<mailto:allen.mcinnes@ttu.edu>>
Sent: Fri, Jun 1, 2012 9:16 am
Subject: Re: Status of Horn Professor Nomination


Dr. Wetherbe,

In your e-mail of May 29, 2012 you requested that I inform you of the status
of your nomination for Paul Whitfield Horn Professor.  I am some what
confused by your request, as I have clearly communicated this information to
you previously. However, let me reiterate that, in my opinion, you are not a
viable candidate for Horn Professor due to the fact that you have chosen not
to engage in the tenure process.   This opinion is based on my interpretation
of the relevant Texas Tech University Operating Policies, as well as past
practice at Texas Tech with regards to the appointment of Horn Professors.
I have spoken with President Bailey regarding this situation, and he concurs
with my decision not to forward your nomination for consideration by the
Texas Tech Board of Regents.

Pursuant to OP 32.09, I will inform the Horn Professors in writing as to the
reasons for my decision.   Bob.


Bob Smith, Ph.D.
Provost and Senior Vice President
Texas Tech University
Box 42019
Lubbock, TX 79409-2019
Tel. 806-742-2184
bob.smith@ttu.edu<www.ttu.edu/administration/provostmailto:bob.smith@ttu.edu>
www.ttu.edu/administration/provost<http://www.ttu.edu/administration/provost>

-----Original Message-----
From: Jim Wetherbe <jcwetherbe@aol.com<mailto:jcwetherbe@aol.com>>
To: bob.smith <bob.smith@ttu.edu<mailto:bob.smith@ttu.edu>>
Sent: Mon, Jun 4, 2012 6:41 am
Subject: Re: Status of Horn Professor Nomination

Dear Dr. Smith:

OP 32.09 does not give you or President Bailey the discretion "not to forward
my nomination for consideration by the Texas Tech Board of Regents." Section
2(c) of OP 32.09 requires that you communicate your recommendation to the
Horn Professors in writing if your recommendation differs from the
recommendation of the majority vote of the committee, and that the President
forward his recommendation to the Board of Regents.

If the President's recommendation differs from the recommendation of the
committee, the President is required to communicate his recommendation in
writing to the Horn Professors.  Assuming President Bailey's recommendation
is that I not be awarded a Horn Professorship, my nomination nevertheless
should have been presented to the Board of Regents on May 17-18, 2012, and I
respectfully request an explanation for the deviation from the OP.

James C. Wetherbe, PhD
Stevenson Chaired Professor of MIS
Associate Dean for Outreach
Rawls College of Business
Texas Tech University
505.250.9999
jcwetherbe@aol.com<mailto:jcwetherbe@aol.com>

[Major revision–posted 7/11/12 (replaces 12/8/09 edition)]



Operating Policy and Procedure

**OP 32.01**:    **Promotion and Tenure Standards and Procedures**

**DATE**:      July 11, 2012

**PURPOSE**:   The purpose of this Operating Policy/Procedure (OP) is to define university-level standards and procedures concerning promotion and tenure. All faculty being considered for promotion and tenure are to be evaluated using the version of OP 32.01 effective on the date of hire, unless they elect to be evaluated using the current version of the policy (subject to the provisions of sections 6.a. and 9. herein).

**REVIEW**:    This OP will be reviewed in November of odd-numbered years by the senior vice provost with recommended revisions presented to the provost and senior vice president (PSVP) by December 15. Any change in this OP must be conducted in accordance with section 9 herein.

**POLICY/PROCEDURE**

A university is a community of scholars whose members are engaged in the discovery, evaluation, transmission, and extension of knowledge. As such, they must be free to search for and express the truth as they find it, whether in the classroom, research/creative activity, or service as members of the community, and regardless of their tenure status. They must also be free from undue constraints, whether imposed from inside or outside the university.

Faculty members' privileges imply correlative responsibilities. In addition to maintaining standards of competence, particularly those relating to scholarship and teaching ability, faculty members are responsible for maintaining the proper attitude of objectivity, industry, and cooperation with their associates within the university. It is a faculty member's professional responsibility to contribute productively throughout his or her academic career.

As persons of learning, faculty members should remember that the public may judge their profession and institution by their utterances and other actions. They should, thus, at all times be accurate, exercise appropriate restraint, show respect for the opinions of others, and exercise every effort to make clear that, as individuals, they do not speak for the institution.

Members of the faculty who are employed in a full-time tenure-track position with Texas Tech University are covered by this OP. The tenure policy does not apply to strictly administrative positions, non tenure-track positions, or part-time appointments. Approval of continuing appointment of persons holding full-time instructional positions that do not acquire tenure is described in OP 32.34. The terms and conditions of every full-time tenure-track faculty appointment shall be stated in the faculty member's letter of appointment and should be in the possession of both the university and the faculty member at the time of initial employment. These terms and conditions shall include departmental guidelines, college guidelines, guidelines for third-year review procedures, and this OP.

OP 32.01

_____

Adopted by the TTUS Board of Regents May 18, 2012

EXHIBIT R

Texas Tech University has adopted a statement of ethical principles (Attachment A) that calls on all members of the university community to accept responsibility for promoting shared ethical principles. All academic appointments and tenure judgments and recommendations rest upon honest evaluation of the faculty member's performance of his or her teaching, research and creative activity, and service responsibilities. Consistent with OP 40.01 and OP 10.12, such judgments and recommendations are to be made without regard to race, religion, gender, sexual orientation, age, national origin, or disability, as defined by the Americans with Disabilities Act, as amended.

In keeping with the mission of the university, tenure and promotion of quality faculty are essential values and processes in strengthening academic quality and reputation. Tenure and promotion also incentivize the university's strategies to promote excellence in teaching, expand and enhance research and creative scholarship, and to further notable outreach and engagement.

1. **Concept and Purpose of Tenure**

   a. Academic tenure is designed to assure the faculty freedom in teaching, research, opinion, and full participation as citizens in the community. The purpose of academic tenure at TTU is also to retain a body of faculty best qualified to help develop and execute the core university mission of advancing knowledge and educating students. The purpose of promotion at TTU is to recognize and reward faculty with records of sustained professional accomplishment that contribute to that mission. TTU is committed to retaining and promoting faculty whose work achieves a high standard of excellence and who demonstrate through the performance of their duties a commitment to professionalism and to the core university mission. The university receives guidance from the AAUP *Statement on Professional Ethics* (http://www.aaup.org/AAUP/pubsres/policydocs/contents/statementonprofessionalethics.htm) adopted in 1966, in determining standards for professionalism, and from the AAUP *Statement of Principles on Academic Freedom and Tenure* (http://www.aaup.org/AAUP/pubsres/policydocs/contents/1940statement.htm), adopted in 1940, in ensuring traditional safeguards for academic freedom.

   b. Academic tenure has been adopted so that Texas Tech University may have the benefit of the competent and honest judgment of its faculty. Tenure recognizes the professional status of university faculty and assures that tenured employment may be terminated only for adequate cause (see OP 32.02 Faculty Non-reappointment, Dismissal, and Tenure Revocation).

   c. Tenure aims at the retention, encouragement, and promotion of the ablest and most promising faculty.

   d. Tenure may normally be obtained only after a period of probationary service. After tenure is granted, the burden of proof rests upon the university when it wishes to dismiss a tenured faculty member.

2. **Procedures for Admission to Tenure**

   a. All departments shall have in place procedures for a third-year review for each untenured faculty member, which is to include a written assessment and recommendation regarding the faculty member's progress toward tenure and promotion.

OP 32.01

_____

Adopted by the TTUS Board of Regents May 18, 2012

EXHIBIT R

b.  A faculty member must complete a reasonable probationary period before acquiring tenure in the university. The maximum probationary period for admission to tenure is the same for all tenure-track ranks. Before the end of a six-year probationary period at Texas Tech University, a tenure-track assistant, associate, or full professor, librarian, or archivist must be notified in writing either that tenure has been awarded or that the appointment will not be renewed at the end of the seventh, terminal year.

c.  Computation of the maximum probationary period begins based on the written terms and conditions indicated in the faculty member's letter of appointment to a tenure-track rank. Probation is not reduced by previous non-tenure-track appointments or by promotions made during that period.

   (1)  The probationary period for admission to tenure shall begin in September of the calendar year in which the appointment is made.

   (2)  After the probationary period begins, all time accrued in full-time service at Texas Tech University in a tenure-track rank will be counted in the probationary period. If extenuating circumstances, as judged by the PSVP, justify a suspension of the tenure probationary period causing the years included not to be sequential, a request for an extension of the probationary period may be made to the PSVP. The request will be initiated by the faculty member, reviewed and commented upon by the department/division chairperson and college dean, and forwarded to the PSVP for a decision.

d.  Exceptions to tenure timeline

   (1)  In exceptional cases, associate professors, librarians, and archivists, and full professors, librarians, and archivists may be hired with tenure when the traditional tenure review procedure precedes the appointment.

   (2)  Faculty members who are promoted in rank shall not thereby acquire tenure unless the normal tenure review procedure has been completed.

   (3)  Tenure may be awarded prior to completion of the full probationary term, although a positive third-year review is strongly encouraged. A faculty member may request early tenure consideration prior to completing the full probationary period without prejudice for later reconsideration. For an early tenure bid, the faculty member's record of accomplishment at Texas Tech University on the standard criteria set by the department and college for admission to tenure is to be the equivalent or more than would be expected at the completion of a full probationary period.

e.  The faculty member has primary responsibility for preparation and submission of a dossier by the start of the sixth year of the probationary period, with guidance provided by the department chairperson, designated representative, or departmental committee (see Attachment B). Material submitted to the PSVP shall be limited to the designated format and should consist of no more than 20 pages, exclusive of all letters, annual reports, curriculum vitae, and department and college guidelines, which must be included in the package or submitted electronically. Any changes in the designated format (Attachment B) must be distributed to the deans by the PSVP no later than April 15 of the year in which the affected candidates are preparing their dossiers.

OP 32.01

_____

Adopted by the TTUS Board of Regents May 18, 2012

EXHIBIT R

    f.    A common format for promotion and tenure dossiers (Attachment B) shall be used to assure fairness in the decision-making process. As promotion and tenure require that a person's professional record and contributions be reviewed, the format calls for information on educational background, previous academic and professional experience, teaching and advising responsibilities, research and scholarly contributions, service and engagement activities since the most recent promotion or tenure decision. Some departments or colleges may wish to add other special categories for review at those levels. A copy of the dossier, either paper or electronic, shall be made available for review by the voting faculty within the department.

    g.    Primary responsibility for the evaluation of the academic qualifications of candidates for tenure rests with the faculty. When the organizational structure permits, four sequential levels exist in the tenure review process. (Note: Colleges and schools may be organized by departments or divisions or function as a single unit. In this OP, "department" and "chairperson" will be used to refer to the basic academic unit of a college and that unit's administrative head.) The tenure review levels include:

        (1)    Evaluation by the department, which includes a vote by the tenured faculty, and a recommendation by the chairperson, who does not attend or participate in the faculty vote;

        (2)    Two events occur at the college level: first, a review by the college tenure committee, which provides a recommendation to the dean; and second, a letter of recommendation provided by the dean, who does not attend or participate in the department faculty vote, nor participate in the vote of the college tenure committee.

        (3)    Review by the PSVP, which includes review and a vote by the dean of the Graduate School, except for candidates from the School of Law, and, at the PSVP's discretion, review and a vote by the vice president for research, and review, but not votes, by faculty members of the provostial staff. In any such deliberations, the greatest possible weight should be accorded to the department's and dean's assessments of the candidate, whose assessments should have carefully considered the faculty's evaluation of the candidate. Any decision to overturn a departmental or college vote by the PSVP should only be made after further consultation with the affected dean or chairperson.

        (4)    Review by the university president, who makes recommendations for tenure through the chancellor to the Board of Regents. The action of the Board of Regents awards faculty members tenure.

**3.  Procedures for Promotion**

    a.    Promotion from assistant to associate professor, librarian, or archivist normally occurs at the same time as the decision on tenure and follows the same procedures. Only faculty at a higher rank may participate in any promotion vote during the department or college review process.

    b.    Promotion from associate to full professor, librarian, or archivist generally follows the same procedures as for promotion to associate, except that only faculty at the higher rank may participate in any vote during the department or college review process.

OP 32.01

_____

Adopted by the TTUS Board of Regents May 18, 2012

EXHIBIT R

4. **General Criteria for Promotion and Tenure**

Academic promotion and tenure are awarded to faculty who make continuing contributions in the areas of teaching, research and creative activity, and professional service, any of which may include outreach or engagement. While promotion and tenure determinations are separate and distinct, similar standards and procedures apply to both. The preservation of quality requires that all persons recommended clearly satisfy the general criteria presented herein. The relative weight given to each of the three components and specific criteria will depend on the standards in the individual disciplines as expressed in the departmental promotion and tenure standards, which must conform to documented college and university standards.

a.   Teaching

Teaching includes activities that contribute to student learning. Evaluation of teaching shall include effectiveness of course content and delivery, student learning outcomes, and demonstration of up-to-date knowledge of the candidate's discipline. In some instances, teaching may be indirect, primarily in support of student learning activities. Faculty members also influence teaching by designing courses and curricula. Textbooks, articles and other contributions to creative pedagogy, and innovative instructional materials, including documentation related to service-learning outcomes, may be considered contributions to teaching. Leading students on studies abroad is another contribution to teaching. In addition, faculty members influence teaching in less tangible, but no less decisive ways, through activities such as counseling students.

Detailed and specific evidence of effective teaching shall be included in the dossiers of faculty members being recommended for promotion and tenure. Each department is to apply its documented procedures for peer evaluations of teaching to each tenure-track faculty member at least annually. Candidates for promotion should also be provided peer evaluations of teaching in, at latest, the semester prior to application for promotion. Evidence in the dossier should be limited to a one-page summary of peer evaluations and student evaluations for each year of service since appointment or previous promotion. The department chairperson, in consultation with the candidate, shall provide the summary of teaching effectiveness, including involvement in graduate education, as applicable. Faculty colleagues should be asked to evaluate the objectives, methods, and materials of courses designed and/or taught by the individual as part of summative peer evaluation. Charts, graphs, portfolios, and other data may be included in appendices and subsequently removed by the dean before submission to the PSVP.

b.   Research and Creative Activity

Faculty are expected to contribute directly to the enhancement and expansion of Texas Tech University's research and creative scholarship. Research and creative activity serve to advance the discipline or the state of the art. Evidence of research and creative activity includes print or electronic publications, non-print presentations, funded grant applications and reports, patents and other intellectual property, curatorships, and artistic productions and performances. Textbooks and innovative instructional materials having significant value beyond this campus may be considered contributions to research and creative activity.

The dossier of an individual should provide substantiating evidence of quality submitted by appropriate observers within and outside the university, such as appraisal of the candidate's

OP 32.01

---

books or artistic performances. Outside reviewers who work in the same or a closely related field, and who have an objective expertise to evaluate the faculty member, shall be selected by the chair in consultation with the faculty member. Wherever appropriate, at least three of the reviewers should be from TTU's national or international peer institutions or aspirational peer institutions. Candidates must disclose which letters come from reviewers with whom they have a relationship that might raise a potential conflict of interest, such as collaborators, coauthors, former professors, or students. The total number of letters is not restricted.

c.  Professional Service

Faculty members are expected to make professional contributions through service to the department, college, university, discipline at large, and, as appropriate, to the broader community. These contributions to outreach and engagement may include discipline-related activities in service to the immediate community, to the state and region, and to society at large , as well as service in one's department and across the university as advisers, committee members, task force members, workshop and symposium participants, international development grant participants, and similar types of activities.

Participation in the activities of professional societies and organizations, especially through service in leadership roles, is a strong indication of professional commitment. Contributions through presentations and consultative services are regarded as further evidence of professional reputation. Such service and activities may include paid (compensated) as well as unpaid work on behalf of the profession.

5.  **Standards for Academic Ranks**

Each department and college may have requirements defined for each rank that exceed those of the university. The minimum university requirements for each tenure-track academic rank are as follows:

a.  Assistant Professor/Librarian/Archivist

In a tenure track, normally, one is appointed as an assistant professor. This initial appointment requires completion of the terminal academic degree (or its equivalent) defined by the department, as appropriate for the position to be held by the candidate, and an ability to teach effectively. Promise of growth in teaching, research and creative activity, and service are also necessary.

b.  Associate Professor/Librarian/Archivist

Promotion from the rank of assistant professor to associate professor, and a tenure decision at this level, requires:

(1)   A demonstrated record of effectiveness as a teacher at Texas Tech University;

(2)   A record of peer-reviewed publication and/or peer-reviewed creative activity that has contributed to the discipline or field of study, to the candidate's intellectual and artistic development, and to the quality of the department;

OP 32.01

_____
Adopted by the TTUS Board of Regents May 18, 2012

EXHIBIT R

      (3)    Generation of external funding, or earnest effort to do so, according to departmental tenure guidelines and commensurate with terms of the faculty member's letter of appointment;

      (4)    A record of engagement of undergraduates or graduate students in research, scholarship, and creative activity in disciplines where such efforts are specified by departmental tenure guidelines;

      (5)    A record of professional service that meets departmental tenure guidelines; and

      (6)    Promise of growth in teaching and research or artistic and creative activity.

c.    Professor/Librarian/Archivist

For promotion to the highest academic rank or a tenure decision at this level, the candidate's academic achievement and professional reputation should be superior and should have resulted in national and/or international recognition. This rank can be earned only by the faculty member who has demonstrated continued growth in, and has a cumulative record of, teaching effectiveness, substantial peer-reviewed publication and/or peer-reviewed creative activity, external funding of scholarship (for those disciplines where such funding is available and expected), engagement of undergraduates or graduate students in research, scholarship, and creative activity, support for those students (for those disciplines where such support is expected), and professional service, which may include outreach and engagement.

6. **Decision-Making Procedure**

a.    Review by the Department

Recommendations for promotion and tenure originate with the department. Each department will develop written procedures to be utilized in promotion and tenure considerations. Each department will also develop specific written standards for promotion to each professorial rank that reflect its mission and, at the same time, meet university criteria. These procedures and standards must have the approval of the dean and the PSVP. Subsequent changes in approved standards or procedures must be similarly approved. After the department, the dean, and the PSVP have ratified written standards, the primary responsibility for evaluating individual promotion and tenure requests in terms of those standards will be assigned to the faculty in the department in which the request is made. If changes are made to a department's promotion and tenure standards and procedures, or a candidate moves to another department, the candidate may choose to use either the new standards and procedures or the ones in effect when hired (if being considered for associate rank) or those in effect when the candidate was last promoted (if being considered for promotion to full professor).

      (1)    Department procedures shall identify the nature and composition of promotion and tenure committees. Procedures must allow for a formal vote of appropriate faculty members. The faculty vote should be strongly considered throughout the promotion and/or tenure process. Each department shall determine in advance its voting criteria, subject to adhering to university guidelines, and the college of which the department is a part must approve these criteria. Faculty votes shall be unsigned. Voting faculty should be made aware that written ballot comments will become part of the promotion/tenure dossier. Written ballot comments are encouraged because of insights

OP 32.01

they provide to the pattern of voting and to peers' considerations of the candidate's record. The chairperson and one other individual shall count the ballots and certify the vote in writing. Faculty members holding ranks equal to or higher than that to which the person desiring promotion aspires shall constitute the eligible voters, whether or not these individuals are tenured.

(2)     The candidate shall prepare, in cooperation with the designated department representative or committee, the formal promotion and tenure dossier. Once the dossier has been submitted for consideration in the department, no further information should be added to the dossier, other than that required by department and collegiate procedures with regard to recommendations by review committees, department chairpersons, or the dean. Each dossier shall contain a signed statement by the candidate indicating that the candidate has reviewed all contents of the dossier as prepared for submission to the dean and the department/college committee.

(3)     In transmitting a recommendation to the dean, a department chairperson must indicate who has been consulted, the form of the consultation, the faculty vote, the vote of any departmental committee charged with the recommendation, and the chairperson's own vote, positive or negative (the department chairperson may not abstain). The recommendation of the department chairperson will be provided to the candidate at the time it is forwarded to the dean. Faculty members may then request without prejudice, in writing, that their dossiers be withdrawn from further consideration, in which case the dossiers will not be forwarded.

(4)     At Texas Tech University, it is not possible to hold different academic ranks in different departments. Therefore, for a faculty member who holds budgeted joint appointments in two academic departments, the recommendation for promotion and tenure must be a joint submission of both departments concerned, and the promotion and tenure recommendation shall be considered positive only if both departments make positive recommendations. Recommendations must be processed according to the regular procedures of both departments. It is incumbent upon the chairpersons of both departments to ensure initiation of the review process.

(5)     If a faculty member holds less than a half-time appointment in one department and more than a half in another department, the recommendation will be made by the department where the major responsibility lies. It is the primary department's responsibility to originate consideration and to inform the secondary department of its intent. For these unequal joint appointments, recommendations must be processed according to the regular procedures of both departments. However, while the secondary department must process the candidate according to its normal procedures, the outcome of its deliberation will be provided to the primary department. The primary department shall take into consideration the secondary department's opinion and shall include it as part of the dossier. These specifications apply to all joint appointments, whether or not the salary is divided by source.

(6)     In addition to the required consultation with faculty members of senior rank within the department and the joint consideration of joint appointments, originating departments are urged to consult with other individuals who may have special knowledge of the performance of candidates and to solicit letters from such persons. Examples of such persons include faculty members from other departments if candidates under

OP 32.01

_____

Adopted by the TTUS Board of Regents May 18, 2012

EXHIBIT R

consideration have taught a number of students from those departments, served on committees in those departments, or engaged in interdisciplinary teaching or research with members of those departments. It is also appropriate to solicit letters from administrative officers in various parts of the university concerning service by the candidate. Any such written correspondence is to be part of the dossier as prepared for submission to the dean and reviewed by the candidate.

(7)    The majority of comments related to a candidate's credentials should come from qualified persons outside Texas Tech University. Letters from reviewers shall be solicited by the chairperson or designated representative and become a part of the candidate's dossier. The reviewers shall be selected by the chair in consultation with the candidate. Reviewers shall be asked to comment on the quality of published research or creative activity of a candidate, on service to professional or other organizations, on the candidate's teaching, or on relevant matters within their competence to judge. Reviewers should not be asked simply "Does this individual merit promotion?"

All letters solicited from within or outside the university shall be included in the dossier so that review bodies may have access to all relevant information. Prospective reviewers shall be informed that the letters become a component of the dossier.

(8)    A department may have too few voting-eligible faculty to provide sufficient review. In such cases, the department chairperson, in consultation with the dean, should seek the advice of an existing executive committee or other college-wide body, or may appoint an appropriate advisory committee for review of a specific case. The composition of the committee and its recommendations must be reported in the dean's recommendation to the PSVP.

b.   Review by the College or School

(1)    It is the responsibility of the dean to recommend either positively or negatively on all promotion and tenure recommendations forwarded by department chairpersons. The dean shall forward to the PSVP all dossiers and recommendations together with a statement indicating the reasons for each recommendation. In all cases, information regarding the dean's recommendation will be provided to the department chairperson and the candidate. A candidate for tenure and/or promotion may then request in writing that the dossier be withdrawn from further consideration, in which case the dossier will not be forwarded, without prejudice.

(2)    In the process of reviewing the recommendation, the dean will seek formal advice of an executive committee or other appropriate college-wide committee. In making a recommendation to the PSVP, the dean will specify the nature of the report and the vote of the committee.

c.   Review by the Provost and Senior Vice President

It is the responsibility of the PSVP to receive dossiers and recommendations regarding promotion and tenure, to review them with respect to the department, college or school, and university standards, and to approve or disapprove all recommendations received.
A review and vote by the dean of the Graduate School will be included at this stage in the decision-making process, except for candidates from the School of Law. At the PSVP's

OP 32.01

_____

Adopted by the TTUS Board of Regents May 18, 2012

EXHIBIT R

discretion, review and a vote by the vice president for research and review, but not votes, by faculty members of the provostial staff may also be included. The PSVP will meet with each collegiate dean and discuss that dean's recommendations. The PSVP will subsequently transmit dossiers and recommendations to the president.

d.   Review by the President

It is the responsibility of the president to receive all recommendations regarding promotion and tenure from the PSVP, to review them, and to approve or disapprove the recommendations. After the review, the president will meet with the PSVP and discuss the recommendations. The approved recommendations will thereafter be transmitted to the chancellor for review of the recommendations, and then to the Board of Regents for final consideration.

7.   **Documentation**

a.   Materials to be provided by the Candidate to the Academic Unit

(1)   Appropriate supporting materials that cannot be provided from academic unit files;

(2)   All materials required by the academic unit's procedural guidelines, and in particular, each of the candidate's annual faculty reports with chairperson's assessments, and a report of the third-year review in the case of probationary assistant professors; and

(3)   Summaries of research and creative activity, including external funding activity, professional service, and, in consultation with the unit head, summaries of teaching effectiveness. The teaching summary should clearly delineate contributions to graduate education (if applicable) such as teaching of organized graduate courses, chairing or memberships on thesis and dissertation committees, mentoring individual graduate students, and similar activities.

b.   Materials to be provided by the Department Chairperson to the Dean

(l)   A separate letter concerning each candidate giving the following information:

(a)   Chairperson's recommendation with evaluation of the candidate's teaching effectiveness, research and creative activity, and professional service;

(b)   The summary vote of appropriate faculty members;

(c)   The summary vote of any departmental committee making recommendations to the chairperson; and

(2)   Another section that includes the unsigned ballot comments, separated from the ballots.

(3)   A file concerning the candidate containing letters or memoranda of advice, opinion, evaluation, or recommendation. Chairpersons should prepare a summary of the qualifications and purpose for selection of each individual from whom a letter has been received, and must disclose which, if any, of the reviewers have had a personal relationship with the candidate (e.g., collaborator, coauthor, former professor, or

OP 32.01

_____

student). This information shall be submitted along with the letters. Departmental procedures for soliciting letters shall be included in the written procedures for promotion and tenure developed by the unit.

    (4)    Complete dossier of the candidate organized in the specified format (Attachment B). Copies of publications, works of art, etc., should be included only if specifically requested by the dean. Copies of these materials will not be forwarded to the PSVP unless requested.

    (5)    It is the responsibility of the department to clarify, when appropriate, why the candidate is uniquely qualified for promotion or tenure, i.e., to reflect any circumstances that are not readily apparent.

c.    Materials to be Supplied by the Dean to the Provost and Senior Vice President

    (1)    A cover letter summarizing collegiate procedures;

    (2)    A letter of recommendation by the department chairperson for each candidate;

    (3)    A letter of recommendation by the dean for each candidate, including the department vote; and/or

    (4)    Recommendations of any college-wide review committee, including the summary vote of each such committee; and

    (5)    The dossier of each candidate, excluding appendices, but including letters solicited by the chairperson.

## 8. Appeal of Decision Not to Recommend Tenure

Faculty who contend they have been denied the recommendation for tenure or promotion improperly or unfairly due to (a) considerations that violate academic freedom,; (b) constitutionally impermissible reasons; or (c) significant noncompliance with the university's established standards or procedures may address their concerns to the Tenure Advisory Committee through the PSVP, who shall forward them to chair of the Tenure Advisory Committee. The composition and responsibilities of the Tenure Advisory Committee and the Hearing Panel procedures are those set forth in OP 32.02, Faculty Non-reappointment, Dismissal, and Tenure Revocation, Section 2.(b)(3).

## 9. Policy Revision and Implementation

Under the statutory authority of the state of Texas, the Board of Regents has the sole authority to revise this tenure policy. Proposal of revisions is the joint responsibility of the PSVP and the Faculty Senate in accordance with the principle of shared governance. In addition to the regular reviews, the Tenure Advisory Committee, the Faculty Senate, or other academic groups may submit proposals for revision at any time. Proposals approved by the PSVP will be reviewed by the Faculty Senate. If the Faculty Senate approves the proposed revisions but judges that they represent significant changes to the intent, standards, or procedures of the policy, the Faculty Senate shall present them to the voting faculty for consideration. In this process, the voting faculty* will vote for approval or disapproval of the proposals. If approved by a majority of those

OP 32.01

_____

Adopted by the TTUS Board of Regents May 18, 2012

EXHIBIT R

voting, the proposals shall be forwarded by the PSVP to the president for his/her review. If the president approves the proposed revisions, they will be forwarded to the chancellor and then to the Board of Regents for consideration. Proposed revisions that are not deemed by the Faculty Senate to require a faculty vote shall be sent directly from the PSVP to the president. If the president approves them, the president will take the recommendations to the chancellor and then to the Board of Regents. (*All tenured or tenure-track faculty on full-time appointments who have completed a residence of at least one year at this university.)

The revised policy is to be implemented immediately upon approval by the Board of Regents. Faculty members being considered for promotion or tenure will have the opportunity to choose to be evaluated under the policy in effect on the date of their hire (if being considered for promotion to associate professor) or the date of their last promotion (if being considered for promotion to full professor) or the current policy (see Attachment B). The tenure of faculty members who have attained tenure under prior versions of this policy at Texas Tech University continues. This policy shall not be applied in derogation of any faculty member's contract rights as set forth in the faculty member's letter of appointment.

10. Related Operating Policies

   OP 32.02, Faculty Non-reappointment, Dismissal, and Tenure Revocation
   OP 32.06, Faculty Responsibility
   OP 32.17, Faculty Appointments and Titles
   OP 32.34, Approval of Faculty in Non-tenure Acquiring Ranks


Attachment A: *Texas Tech University Statement of Ethical Principles*

Attachment B:  *Promotion and Tenure Dossier Format*

OP 32.01



TEXAS TECH UNIVERSITY

Office of the President

July 20, 2012

Dr. James Wetherbe
Texas Tech University
Business Administration
MS 2101

Dear Dr. Wetherbe:

I concur with the Provost's decision regarding your nomination for Horn Professor.

Sincerely,

Guy Bailey

cc:  Bob Smith, Provost



**TEXAS TECH UNIVERSITY**
# Rawls College *of* Business™

July 27, 2012

President Guy Bailey
Texas Tech University
Lubbock, Texas

Dear Dr. Bailey:

Thank you for your letter dated July 20, 2012, which was received by me on July 23, 2012.  Your letter consists of the following statement: "I concur with the Provost's decision regarding your nomination for Horn Professor."

The Faculty Grievance Committee recommended that "the process continue by forwarding of the Horn Committee's ballot sheet and recommendation letter to the President and that the President subsequently forward his recommendation to the Board of Regents."

I respectfully request that you clarify whether or not you intend to present my nomination to the Board of Regents at its meeting on August 9-10, 2012, in El Paso, with your recommendation that the nomination not be approved.

Section 4(d) of OP 32.05, Faculty Grievance Procedures states in part, "If the president's decision differs from that recommended by the Grievance Committee, the written reasons for such difference will be provided to the grievant and the committee."

Kindly provide the written reasons for your decision as required by OP 32.05.

Further, you fail to address the other recommendations of the Faculty Grievance Report including but not limited to the recommendation that "Professor Wetherbe's contract with Texas Tech which has been in effect for the last 12 years should continue to be honored."

Please provide me with a written statement of your position regarding the status of my contract with Texas Tech University.

Sincerely,

James C. Wetherbe
Stevenson Chaired Professor of MIS
Associate Dean for Outreach

EXHIBIT T                                    JW-000230



**TEXAS TECH UNIVERSITY**
College *of* Human Sciences™

Office of the Dean

Rawls College of Business Dean Search – Organizational Meeting

Minutes

November 18, 2011 – 1:30 pm (Human Sciences 102)

*In Attendance*: Claudia Cogliser, Scott Cooksey, Dakshina DeSilva, Shelby Hunt, John Kobza, Michael Lewis, Juan Munoz, Cecil Preas, Jorge Ramirez, Bob Rhoades, Robert Ricketts, James Wetherbe, Dean Linda Hoover

*In Attendance via conference call*:  Bobby Stevenson, Regent Larry Anders, Randy Andrews, and Debbie Laverie.

*Guest in Attendance*: Provost Bob Smith

*Committee members not in attendance*:  Tim Hudson, Mark Johnson, and Jerry Rawls

Dean Hoover welcomed everyone and the meeting began with committee member introductions.

Provost Smith began his charge to the committee by thanking everyone for their time and accepting of service on this committee and Dean Hoover's accepting to the invitation to lead the search effort.

Provost Smith described the desired characteristics for the new Dean.
- Scholar and an innovator
- Outstanding communicator
- Excellent academic and teacher
- Unselfish
- Outreach and development experience
- Sage observer of the world of business
- Academic Research

Provost Smith continued with his thoughts on possible goals for the new Dean.
- Steps to prevent insularity in college; have faculty think about the university first
- More Global Outreach: Teaching & Research
- Have ethics permeate the curriculum
- Consider extramural support, especially corporate support
- Consider economies in budget within the framework of ASCSB accreditation
- Departmentalization
- Reinventing undergraduate curriculum

Provost Smith conveyed that the committee should identify 5-6 candidates for short, off-campus interviews that he wishes to sit in on and observe. Subsequently that group should be narrowed to a short list, with 2 or 3 selected for on-campus interviews. The search committee should provide the 2 or 3 *unranked* finalists.

Provost Smith stated that when the final candidates are selected, he would ask everyone on the committee for their personal views before he would make the final decision. He emphasized that the search will not preclude candidates from any sector, including government service or the corporate realm. He also emphasized the need for privacy and confidentiality concerning the candidates until the university was ready to bring them to campus.

Dean Hoover announced the members of the Executive Committee as Debbie Laverie, Shelby Hunt, Randy Andrews, and Jorge Ramirez and explained that the charge of this committee was to research, interview, and select one of the two possible search firms: Academic Search and Greenwood/Asher & Associates, Inc. She announced that Academic Search was ultimately selected, and Dr. Bob Lawless would be our consultant.

Regent Anders inquired about the development of a job description. Dean Hoover noted that the search firm would be assisting in creating of the job description and ads, developing the candidate role, and guiding the interview process. Dr. Lawless will attend all meetings communicating with the candidates and the committee throughout the process. A website with position and candidate information will be established and access provided to the committee. Dr. Lawless will help with reference checks, preliminary interviews, due diligence, campus visit guidelines, spousal involvement, etc. He will provide recommendations, communicate with the finalist, as well as the hiring officer. Finally, he will provide information on how to launch a successful leader and provide transition information.

The meeting was then opened for questions.

EXHIBIT U

Mr. Lewis inquired about a timeline. Dean Hoover conveyed that a timeline will be determined once she has consulted with Dr. Lawless. Mr. Lewis asked about the constituents that Dr. Lawless will interview. Dean Hoover indicated that key faculty, staff, alumni, and students, as well as members of the community will be included.

Dr. Munoz mentioned the need to be aggressive in our preparation of the job description and timeline as this is the time people are looking. He also recommended that Jay Killough, University Career Services, be present for the forums.

Provost Smith expressed the advantages for the new Dean.
- New building
- Solid faculty and student community
- Handsome endowment in the business school
- Dedicated and loyal alumni

Provost Smith thanked Dean Hoover and the committee members once more and exited the meeting.

Dean Hoover inquired if the committee desired to add a representative from the Finance Department to the Search Committee. The committee agreed to provide nominees that Dean Hoover will forward to the Provost.

Dean Hoover concluded the meeting by thanking everyone again for their willingness to serve and notified that she would be in touch once she has consulted with Dr. Lawless and Provost Smith.



TEXAS TECH UNIVERSITY
Rawls College *of* Business‍

Rawls College Of Business Dean Search
Candidate Interview Questions
Texas Tech University

1. Why are you interested in this position?
2. It is important that academic leaders have an equal, respected and occasionally confidential voice in the future of Rawls College of Business. What mechanisms, formal and informal would you employ to insure that there is a free flow of ideas between each program head or department head and the Dean's Office?
3. What has been your experience with external fund development? Specifically, what has been your experience with securing private, philanthropic gifts from individuals, corporations and/or foundations?
4. What experience do you have with accreditation?
5. The Provost asked that we ask each candidate the following questions for his presentation to the board. Are you currently tenured? Please provide a summary of your tenure history.
6. What is your perception of the importance of a doctoral program in a college of business?
7. What have you done related to faculty/student recruitment and efforts to enhance diversity?
8. What experience do you have with budgeting?
9. Knowing what you know about the college, what do you perceive to be strengths and weaknesses?
10. Give an example of a bold and controversial decision you have made in your professional career and describe why you acted as you did, and the outcome for your organization.
11. How do you maintain high morale and productivity of the faculty, staff, and administrators with whom you work?
12. What are one or two or your proudest professional accomplishments?
13. What do you want us to know about you that we did not ask?
14. Do you have any questions for us?

EXHIBIT V

# Rawls College Of Business Dean Search
## Draft Interview Questions
### Texas Tech University

1. Tell us a little more about your professional experiences, particularly those things that we cannot glean from your resume and that which you think most uniquely qualifies you for this position.
2. Perhaps you have spoken with a close friend, family member, or colleague about your reasons for wanting to work at Rawls college of Business. If you were explaining your reasons to one of these people, what would you say?
3. It is important that academic leaders have an equal, respected and occasionally confidential voice in the future of Rawls College of Business. What mechanisms, formal and informal would you employ to insure that there is a free flow of ideas between each program head or department head and the Dean's Office?
4. We have, over time, become a state-assisted rather than a state-funded institution. This has placed increased pressure on Rawls College of Business to generate external funds. What has been your experience with external fund development? Specifically, what has been your experience with securing private, philanthropic gifts from individuals, corporations and/or foundations?
5. What experience do you have with accreditation?
6. What has been your experience with doctoral programs?
7. What have you done related to faculty/student recruitment and efforts to enhance diversity?
8. Are you familiar with Responsibility Centered Management concepts and principles? What experience do you with budgeting?
9. Knowing what you know about the college, what do you perceive to be strengths and what would you change?
10. At times, administrators are called upon to make decisions and take action that may be viewed by others as risky, unpopular or contrary to their colleagues', the faculty or their supervisor's perspective. Can you give us an example of such an action that you have taken in your professional career? Describe the situation, why you acted as you did, and the outcome for your and the organization.
11. What are the characteristics that you prize most in an employee? What behaviors or characteristics do you find intolerable? What do you do to encourage other to do their best?
12. Please give details about a difficult situation that you have handled, your strategy of approach and the challenges faced. In retrospect, what would you have done differently?
13. How do you maintain that morale and productively of the faculty, staff, and administrators with whom you work?
14. What are one or two or your proudest professional accomplishments?
15. What would your colleagues and your boss say about you?
16. What do you want us to know about you that we did not ask?
17. Do you have any questions for us?

## Rawls College Of Business Dean Search
## Draft Interview Questions
## Texas Tech University

1. Tell us a little more about your professional experiences, particularly those things that we cannot glean from your resume and that which you think most uniquely qualifies you for this position.

2. Perhaps you have spoken with a close friend, family member, or colleague about your reasons for wanting to work at Rawls COB. If you were explaining your reasons to one of these people, what would you say?

3. It is important that academic leaders have an equal, respected and occasionally confidential voice in the future of Rawls COB. What mechanisms, formal and informal, would you employ to insure that there is a free flow of ideas between each program head or department head and the Dean's office?

4. We have, over time, become a state-assisted rather than a state-funded institution. This has placed increased pressure on Rawls COB to generate external funds. What has been your experience with external fund development?

5. Knowing what you know about the college, what do you perceive to be strengths and what would you change?

6. At times, administrators are called upon to make decisions and take action that may be viewed by others as risky, unpopular or contrary to their colleagues', the faculty or their supervisor's perspective. Can you give us an example of such an action that you have taken in your professional career? Describe the situation, why you acted as you did, and the outcome for you and the organization.

7. What are the characteristics that you prize most in an employee? What behaviors or characteristics do you find intolerable? What do you do to encourage others to do their best?

8. Please give details about a difficult situation that you have handled, your strategy of approach and the challenges faced. In retrospect, what would you have done differently?

9. How do you maintain the morale and productivity of the faculty, staff and administrators with whom you work?

10. What are one or two or your proudest professional accomplishments?

11. What would your colleagues and your boss say about you?

EXHIBIT W

1/24/2012

Bobby G. Stevenson                    303-220-8999

5251 DTC Parkway
Suite 285
Greenwood Village, CO 80111

April 30, 2012

Provost Bob Smith
Texas Tech University
Lubbock, Texas 79409

Dear Provost Smith ,



Thank you for your email of Friday, April 27 in which you state
that if I have additional questions or concerns you are pleased
to respond. Thank you for that opportunity. My concerns and
questions are below.

Having worked with every Dean of the Rawls College for the
past four decades and served on the search committee for the
new Dean this year, I am very troubled by questionable and
unethical practices in the search process that has been
overseen by you.  At a minimum some of these practices place
Texas Tech at a disadvantage in recruiting a new Dean for the
Rawls College.

Perhaps some insights from you would remedy my concerns.
Accordingly, I am expressing them to you below for your
consideration and response.

**First,** given that Dean McInnes had announced his resignation
last summer, we should have had an advantage by recruiting
early. We lost that due to a late start as result of poor
oversight. Most universities searching for Deans have already
concluded (e.g., Minnesota, Arkansas, Iowa, Central Florida
and Xavier) while we haven't even completed our interviews.

EXHIBIT X                                    JW-000129

Bobby G. Stevenson                    303-220-8999

5251 DTC Parkway                          2
Suite 285
Greenwood Village, CO 80111

**Second,** I was quite frankly alarmed to see you present during the search committee off-campus hour interviews and deliberations. You appointed a chair and your presence in my opinion was inappropriate. I have asked others, including another Provost, and they agree. Further, you said you were only present to observe and would be like a "fly on the wall." Then, to my astonishment, you asserted yourself into the deliberations, including a debate with Dr. Hunt over Dr. Klock from UAB, a candidate Dr. Hunt did not favor that you did. Dr. Hunt is a Horn Professor and less inclined to feel intimidated by a challenging exchange with you as a Provost. How should the lesser faculty or other search committee members feel comfortable expressing opinions that might contradict those of the Provost's?



**Third,** based upon hearsay from **one** unnamed individual, you broadcast an email to the search committee, faculty and staff alerting them to rumors that were allegedly originating from the Rawls College pertaining to a strong internal candidate having the inside track and no one else need apply. Given that it was hearsay, this was questionably motivated and a useless distraction. It was well known Dr. Wetherbe was the only internal candidate. Why would you do that unless it was to possibly discredit the only internal candidate based on gossip which you facilitated spreading? In your email, you emphasized this was a totally open search; hardly credible after you made your presence both *seen* and *heard* during our candidate interviews and deliberations.

**Fourth,** Marketing was the only academic area that had two representatives (Dr. Laverie and Dr. Hunt) from the Rawls College and they outranked the rest of the business faculty. It was only an appearance problem until they (especially Dr. Hunt who stood up for effect) asserted themselves resulting in two of the three final candidates being from Marketing.

**Fifth,** the outside business/alum search committee members who are the non-compensated stakeholders represented only

EXHIBIT X                                    JW-000130

Bobby G. Stevenson                303-220-8999

5251 DTC Parkway
Suite 285                         3
Greenwood Village, CO 80111

7 of the 20 votes or 35% if all are present, but that was not the
case. We as business/alum had short notice to attend two
days of interviewing on March 8-9. This presented scheduling
and logistical problems for most of us and was presumptuous,
if not inconsiderate. I had to use my private jet service at
considerable expense to even make the meetings.

So, after dragging along for months, the out of town business
alumnus committee members were asked to drop everything
and travel for a two day meeting and most could not do that.
As, a result, two of the seven didn't attend at all and two
others only partially attended, limiting their participation in
deliberations. Therefore, of the total full time attendees for
the interviews, there were only three of seven of the full time
representatives of the business alumnus members at all times.
That shouldn't have been a problem since candidates just
needed enough votes to be among the top candidates to be
selected for campus interviews. As discussed below, initially
there was no problem until you deviated not only from your
own instructions, but the committee's recommendations.

**Sixth**, at our first meeting of the search committee in on
November 18, you stated our job was to present our finalists
with **no ranking**. Three months later, after the numbers were
tallied the top four candidates were identified from the nine
invited for off campus interviews. The remaining five
candidates barely scored at all. As I recall it was Regent Anders
who said the drop off is so significant after the top four we
have our four candidates for campus interviews.

So, when we left at the end of two straight days of interviews
and deliberations; we were led to believe that the top four
candidates we recommended would be interviewed. Yet the
following week you eliminated the only internal candidate
claiming you were only going to interview the top three
**ranked** candidates. Again you did not keep your word or
follow your own instructions. The candidates were supposed
to be submitted to you without any ranking. The decision to
go from four to three candidates and eliminating a candidate

EXHIBIT X                              JW-000131

Bobby G. Stevenson                303-220-8999

5251 DTC Parkway
Suite 285                                            4
Greenwood Village, CO 80111

with strong business experience should have been as you said
in your "rumor email" a "totally open" process. I would have
appreciated having deliberations on your concerns while we
were all still available for discussion and have an opportunity
for all business alumnus to weigh in with their point of view.

Surprisingly, the only comment made by faculty about Dr.
Wetherbe was made by Dr. Hunt who stated we need to go
outside but offered no explanation to support his position.
When the Rawls faculty was asked by Dr. Ramirez to comment
on Dr. Wetherbe, we were told by Dr. Lawless it was not fair
to ask them. What was that about in what is supposed to be a
"totally open" search process? All one has to do is look at the
nomination letters for Dr. Wetherbe which have strong
endorsements from other Rawls faculty. The faculty in the
room who I understand were selected by Dr. Laverie (not
elected by the faculty) had nothing to say.

**ciber**®

It was well understood that stronger academic credentials
were needed among the business alumnus than we had with
Dean McInnes. However, the pendulum can swing too far the
other way and we end up with a Dean that cannot be a strong
advocate for the Rawls College within the business world.
With two traditional academic candidates and two who were
hybrids of academia and business we had an excellent pool to
offer to the University for campus interviews.

As a result of your actions an academic with strong business
experience and the only internal candidate was eliminated. Dr.
Wetherbe is highly qualified and received some 20 nomination
letters with glowing recommendations from faculty inside and
outside of Texas Tech, alumni, and a compelling letter from
Dick Schulze, Founder of Best Buy whose board he served on
for over a decade. Further, Dr. Wetherbe is ranked among the
top dozen in his field in both academia and the business
world. He is a distinguished alumnus of the Rawls College who
has a track record for multi-million dollar fund raising and has
donated well over a million to Texas Tech. Yet you *unilaterally*
declared him not worthy to be included in the final interview

EXHIBIT X                                    JW-000132

Bobby G. Stevenson                303-220-8999

5251 DTC Parkway                        5
Suite 285
Greenwood Village, CO 80111

disregarding the search committee's recommendation and understanding.

It is terrible judgment to give up a highly regarded internal candidate when our search process is so far behind schedule compared to other universities who have already appointed Deans. That we are even behind schedule on a national search is foolish and unnecessary. We should have been first in the market for a new Dean instead of hoping for the best of the leftovers, and even they may not be available by the time we get our act together.

Dean searches often fail even when they are executed properly. In our case, it appears deliberate or at least negligent steps have been taken that will increase the likelihood of failure. We have already lost Dr. Stewart from UCR as he took a position at another institution. We would have lost Dr. Klock to Central Florida if he had not come in second there.

**ciber**

Quite frankly, I don't see how your leadership on this crucial search has been consistently conducted in the best interest of Texas Tech and that deeply troubles me. A strong case can be made that you have contaminated the Dean Search process and should not be allowed to have any more input into this critical decision for the Rawls College of Business, including the naming of an interim dean if the search fails. I recently informed the Chancellor that I am so disgusted with your actions I was considering cancelling the $9 million CRUT I established for Texas Tech as an end of life gift. After your email of last Friday I am cancelling until Texas Tech demonstrates ethical leadership with integrity.

The alumnus who volunteer their time and expense to help with this search are long term players unlike some administrators and faculty that come and go to pursue other opportunities. For example, you have served at six universities during your career and have only been at Texas Tech for three. We are stakeholders for life like the rest of the alumnus who

EXHIBIT X                                JW-000133

Bobby G. Stevenson                303-220-8999

5251 DTC Parkway
Suite 285                                    6
Greenwood Village, CO 80111

spend decades supporting and contributing to Texas Tech. To participate in a poorly run and questionable search process is disrespectful.

Your leadership for this critical search at this critical time for the Rawls College quite frankly mystifies me. They only way I can make sense of it is if you have already made up your mind to appoint Dr. Klock which would explain why you debated with Dr. Hunt. Or, alternatively you want the search to fail in which case you would likely appoint Dr. Laverie as interim Dean or Dean and she would not have to compete as a legitimate candidate. In my opinion she is not yet Dean material which is why she was wise not to interview. If either is the case, the search committee wasted months of our time on a charade and I resent it. If this is about getting a predetermined candidate of your choice, I will expect to be reimbursed at least for my travel expenses.



In trying to figure out your point of view, I searched for documentation on the internet as to your thoughts on leadership. My most significant find was material from The University of Arkansas', *All Things Academic* 2008 and *All Things Texas Tech* 2012 both publications you were or are editor.

Within both publications you express approaches to leadership and life based upon *The Wizard of Oz*. You mention a book you are authoring entitled *All Things Oz: A Guide to Wisdom, Heart and Courage*.

You state in the Arkansas publication:

*The Oz story has a message of great value, particularly for those of us who supervise personnel. Why? Because the story embodies the theme of social leadership, which is centered about the value metaphors associated with the Scarecrow, the Tin Woodman, and the Cowardly Lion, namely, learning, loving and serving. And, these values are constants in what I like to*

EXHIBIT X                                    JW-000134

Bobby G. Stevenson          303-220-8999

5251 DTC Parkway                    7
Suite 285
Greenwood Village, CO 80111

*refer to as "the Oz Complex"—constants that have helped*
*nurture and sustain my commitments as provost during the*
*past eight years.*

In the Texas Tech publication you enhance your perspective
on Oz for leadership and life by stating:

*The scarecrow relates to wisdom and learning, the Tin*
*Woodman to heart and loving and the Cowardly Lion to*
*courage and service. Dorothy? She is the leadership person*
*who brings out the best through understanding, heart and*
*courage. Wizard offers model for humility.*

You quote Confucius on humility: *Humility is the solid*
*foundation of all virtues Confucius*

And point out:

**ciber**®  *And through the Way of Oz, we understand the power of*
*integrity, empathy and beneficence to guide one's life, all with*
*ethics in the lead.*

I will now respond point by point to your email with your
statements in bold.

**I understand and respect your advocacy for Dr. Wetherbe. I
also appreciate your service on the Business Dean Search
Committee.**

Let's be clear, I am not his only advocate. He had over 20
nominations for Dean and was in the final four recommended
to you for campus interviews. After committing to be a "fly on
the wall" during the search committee interviews and
deliberations you asserted yourself to express your advocacy
for Dr. Klock in a debate with Dr. Hunt. In the spirit of Oz
where is the integrity and ethics in not keeping your word?

**University dean search committees are organized as advisory
to the provost and president. We always respect committee**

EXHIBIT X                    JW-000135

Bobby G. Stevenson                    303-220-8999

5251 DTC Parkway                          8
Suite 285
Greenwood Village, CO 80111

recommendations but are not bound by them given that the
provost must work productively with the dean after hiring.

You placed 20 capable people on the search committee. In
the spirit of Oz humility and wisdom, where is the humility
and wisdom in rejecting our recommendation as to who to
allow full campus interviews before eliminating our
recommendations? During the one hour off-campus
interviews candidates were allowed little time to express their
vision for the Rawls College and Texas Tech. Can you decide
based upon observing candidates for an hour who you can
work with productively?

Akin to hiring decisions in industry, fitness for service and
compatibility with one's supervisor are key elements in any
hiring effort.



What you mean by "fitness for service" is obscure to me. Dr.
Wetherbe has done nothing but serve Texas Tech for the past
12 years and he is the only professor I know of that makes his
contributions without the safety of tenure. He has brought in
$500,000 in research grants, has stellar teacher evaluations
and continued with his research contributions which include
34 books in a manner worthy of a Horn Professor nomination.
He personally provided seed money and helped the Rawls
College of Business build a newsworthy Executive MBA
program and has assisted the student MIS organization to be
ranked the most improved (last year) and top ranked (two
years) organization on campus. Are there any other faculty at
Texas Tech who have made the million dollar plus
philanthropic contributions Dr. Wetherbe has made for
endowed professorships, excellence funds, buildings and
scholarships?

He serves the business world while on the faculty of Texas
Tech. Did you read what Dick Schulze, Founder of Best Buy
said about Dr. Wetherbe's leadership on the Board of Best Buy
from 1992 to 2005? Are you aware that during the time he
provided strategic leadership, Best Buy stock BBY was one of

EXHIBIT X                                    JW-000136

Bobby G. Stevenson
303-220-8999

5251 DTC Parkway
Suite 285
Greenwood Village, CO 80111

9

the top ten performing stock increasing in value over 500%?
Mr. Schulze's reference letter stated:

*It is hard to imagine you will find a more qualified candidate
given his credentials and experience in academia and the
business world...Jim has great insight into how research can
contribute to business value... (his) research results have
provided meaningful insights to Best Buy...and have been
published in research journals.*

In the spirit of Oz, are you truly confident enough in your
personal wisdom to disregard the recommendations of Mr.
Schulze **and** the collective wisdom of the business members of
the search committee—at least to the point of not allowing
Dr. Wetherbe a full campus interview?



Does your comment on compatibility line up with your "OZ"
position on courage and wisdom? You make reference to
hiring decisions in industry. As an entrepreneur who has built
a billion dollar international company CIBER, I can speak to
hiring decisions in industry. We view seeking compatibility as
seeking a "yes" man which can dangerously lead to group
think. As soon as leaders go unchallenged by subordinates, the
organization is at risk. I state unequivocally that Dr. Wetherbe
is courageous in his principles. For example, as chair of the
compensation committee on the Board of CIBER he was out
numbered fighting against an overly generous compensation
plan for a retiring CEO. I recall him calmly pointing out what
happened at Enron when Dr. Jaedicke an accounting professor
from Stanford didn't stand up to their board.
He fought hard, with facts and saved shareholders over three
million dollars. If he chose to be "compatible" with other
board members those savings would not have occurred. Isn't
this the type of courageous financial responsibility needed in
higher education?

Quite frankly in building a successful enterprise, it is often the
staff that are the most challenging and make me the most
uncomfortable by standing up to me that are the most helpful

EXHIBIT X                              JW-000137

**Bobby G. Stevenson**          303-220-8999

5251 DTC Parkway
Suite 285                       10
Greenwood Village, CO 80111

in moving organizations forward. I don't care if they are "buddies" as long as they get results.

Should compatibility with alumnus and faculty not be considered as well? Did you read the nomination letters from faculty and alumnus? Are you aware of the relationships Dr. Wetherbe has with the Dean's Advisory council which is made up mostly of alumnus? He is among only 50 distinguished alumnus of the Rawls College. Yet he doesn't even deserve a campus interview?

For the sake of Texas Tech, my hope is you are willing to be the type of leader who has the heart, courage and wisdom to want to be challenged with facts and principle at times when they are not compatible with yours?
Further, if you are harboring some feelings towards Dr. Wetherbe whether based on gossip (e.g., inside track rumor) or fact, shouldn't he have the same clean slate as all other candidates? Shouldn't you, just as a jury is instructed, disregard history you don't have with other candidates in your consideration?

**Accordingly, I took the time to sit in on all the off campus interviews. Based on my observations and the recommendations made by the committee, we have chosen to invite to campus the three candidates who have been scheduled.**

First, I think your presence and observation was not appropriate and I believe intimidating to those subordinate to you in the room. Second you should have kept your word and not asserted your opinions on any candidates let alone one you clearly favored. I don't know who "we" is in the sentence above but the search committee recommended Dr. Wetherbe be interviewed as part of your consideration and final selection. It is your prerogative not to select him just as it is my prerogative as alum to decide if your office is conducting itself in a manner worthy of philanthropy.

EXHIBIT X                                    JW-000138

Bobby G. Stevenson          303-220-8999

5251 DTC Parkway                 11
Suite 285
Greenwood Village, CO 80111

If you have additional questions or concerns, I will be pleased to speak with you.

Will you honor your process and grant Dr. Wetherbe a fair opportunity to interview? There are no travel costs and I promise not to complain again about mine. You will have respected the recommendations of the search committee and the many who nominated Dr. Wetherbe.

Do you have the heart, courage, wisdom and humility to consider that an entrepreneur can offer you worthy counsel?

The final selection is still yours to make, though I do believe you have tainted the entire process to fulfill some agenda for which you have not been forthcoming.

ciber  After Dr. Wetherbe is interviewed, whatever decision you make I will not challenge. Is that not fair and in the best interest of Texas Tech?

**Thank you again for your service to Texas Tech.**

Thank you for the opportunity to express myself in an honest manner even if it is not compatible with your views.

Thank you for your time and I look forward to hearing from you.

Bobby G. Stevenson
5251 DTC Parkway, Suite 285
Greenwood Village, CO 80111
303-220-8999
bobbyg@ciber.com

cc President Guy Bailey

    Chancellor Kent Hance

EXHIBIT X                                    JW-000139

Bobby G. Stevenson          303-220-8999

5251 DTC Parkway
Suite 285
Greenwood Village, CO 80111

May 17, 2012

Provost Smith
Texas Tech University
Lubbock, Texas 79409

Dear Provost Smith,

After waiting two weeks for a response to my letter of April 30, 2012, you are unresponsive to the key points raised about your leadership and oversight of the dean search process.



1. You provided no reason why our search was completed after all other major university searches (e.g., Minnesota, Arkansas, Central Florida, Southern Florida, Iowa and Xavier).  Instead you gave a schedule that stalled for no apparent reason on October 7, 2011. No explanation was provided as to why after that it lagged into May. The delay cost us one of our top four candidates, Dr. Stewart. We don't know what candidates we lost to the universities listed above. We do know that Dr. Klock, one of our other top four candidates, finished second at Central Florida or we would have lost him as well.

2. You justify your presence in the off campus interviews because several other Provosts in the Big XII follow the same practice. Are you aware Dr. Lawless, the search consultant you hired, indicated it was unusual for a Provost to be present during interviews? Hardly an endorsement of your conduct from someone who says he has seen it all and little surprises him anymore.

EXHIBIT Y                          JW-000144

**Bobby G. Stevenson**     303-220-8999

5251 DTC Parkway
Suite 285
Greenwood Village, CO 80111

3.  You did not address my concern that you did not keep
    <u>your</u> word that you would be a "fly on the wall" and
    only observe. Your defense is that you never asserted
    yourself into candidate interviews which were already
    laden with predetermined questions. My objection is
    that you debated with Dr. Hunt between interviews
    signaling your preference (as the most influential
    person in the room) for a candidate.

    Contrary to your claim, your comments were <u>not</u>
    limited to institutional standing and prestige of UAB. I
    was there and heard what you said. You argued in
    favor of Dr. Klock's qualifications as well. For example,
    one issue debated was his lack of experience in a PhD
    granting business school, which was one of our
    selection criteria. How could your subordinates if not
    intimidated by your assertiveness, not at least become
    reluctant to express their opinions? Perhaps others are
    reluctant to call you on it, but there were discussions
    after the interviews that your preference for Dr. Klock
    was made clear by your animated assertions.

    Sitting across from the faculty, their body language
    and whispering among themselves said it all. It was
    clear a unified effort would be needed to challenge Dr.
    Klock's appointment by you. Which is unfortunate
    because as I shared with the Chancellor, I thought Dr.
    Klock's entrepreneurial experience made him a strong
    candidate and I voted for him. Can you not see how
    not honoring your word tainted the process? I have
    been around the business school long enough to know
    that faculty will reject even a good idea if they feel it is
    being forced on them. A faculty member commented
    before the interviews, "I don't know why the Provost
    doesn't just tell us who he wants to hire and save us
    the effort." Can you see how your behavior supports
    that type of cynicism?



Bobby G. Stevenson          303-220-8999
5251 DTC Parkway
Suite 285
Greenwood Village, CO 80111

4.  You provided no response to my objection to your
    hearsay rumor email which appeared to be aimed at
    starting rumors rather than preventing them about the
    only internal candidate—Dr. Wetherbe.

5.  You state that many people were consulted prior to
    appointing members to the search committee which
    does not address how the members were
    <u>recommended</u> to be appointed in the first place.
    Specifically, were faculty elected within the college or
    who was given authority to recommend them? By the
    time faculty recommendations reached the President
    and Chancellor was it not an unchallenged formality?
    The only change I recall was the protest that there was
    not representation from Finance which was remedied
    by the search committee at our first meeting.



6.  You were unresponsive to my key point on external
    business representatives. The scheduling protocol
    resulted in only three of seven business/alumni
    representatives being available for the entire
    interviews and deliberations. For a nine month long
    search process, we who faced the greatest logistic and
    scheduling problems to attend were given less than
    two weeks notice to make three to four days (with
    travel) available. The only complete search committee
    groupings available for the entire two days of
    interviews were the local Texas Tech faculty and staff
    who could walk across the street from campus. As a
    result, business/alumni were not fully represented as
    should have been the case.

7.  You did not respond to why you did not honor your
    commitment to a "totally open" process. When the
    search committee completed what we thought were
    open deliberations, we left believing our four
    recommendations were accepted. That was stated by
    several people in the room as we concluded our

Bobby G. Stevenson          303-220-8999

5251 DTC Parkway
Suite 285
Greenwood Village, CO 80111

deliberations. Why didn't you express your reservations for Dr. Wetherbe as freely as you expressed your support of Dr. Klock with the search committee? Did we not have the right after all of our efforts to collectively share our thoughts in an open forum with you before you announced elimination of Dr. Wetherbe a couple of days later?

8. You say you cannot legally comment on qualifications of a candidate or candidates. The critical questions I asked were not about qualifications. So I will repeat; how can you ignore the recommendation of 20 search committee members and over 20 nominations/references and not even allow a campus interview for Dr. Wetherbe?

9. You stated that: "...I can say that every decision relative to interviews was made collectively with President Bailey." Let's be real clear on what you mean by "collectively" as up until now I have only had issue with your oversight of the search process.

   a.  Are you claiming you fully disclosed to President Bailey that four candidates were recommended for campus interviews including Dr. Wetherbe? Are you claiming that you fully disclosed the search committee believed at the end of two days of interviewing on March 9 that all four would be interviewed? Also, did you share the nominations, references and acceptance letter of Dr. Wetherbe with President Bailey? Provided with that information, are you claiming that President Bailey agreed to eliminate Dr. Wetherbe from a campus interview?

   b.  Are you claiming that after Dr. Stewart dropped out as one of the four originally recommended candidates that President Bailey, fully informed as described in 9a above, agreed to bring in a

EXHIBIT Y                          JW-000147

Bobby G. Stevenson        303-220-8999

5251 DTC Parkway
Suite 285
Greenwood Village, CO 80111

candidate who was not recommended in the
original final four by the search committee instead
of Dr. Wetherbe?

c.   Did you advise President Bailey to not spend an
hour to hear Dr. Wetherbe's vision for the Rawls
College and Texas Tech? When Texas Tech is
incurring the expense to fly in another candidate
twice from Singapore, does Dr. Wetherbe, a
philanthropic, distinguished alumnus not even
deserve as little as an hour when it just requires a
walk across campus.

d.   Why didn't you take an hour of time to hear Dr.
Wetherbe's vision for the Rawls College and Texas
Tech?

10. You provided no explanation as to what you mean by
<u>fitness for service</u> or clarification on <u>compatibility</u> and
how either related to eliminating Dr. Wetherbe from a
campus interview. After you sent out your rumor email
I could understand why Dr. Wetherbe would consider
you incompatible as a supervisor. Nonetheless, he still
accepted his nominations to become a candidate
which demonstrates his willingness to work with you.
Will you please explain what you mean by fitness for
service and compatibility as it pertains to Dr.
Wetherbe?



I have always accepted and stated the final dean selection
decision lies with you as Provost and President Bailey.

My objection remains; you eliminated a highly qualified
candidate from a campus interview where he could share his
vision for the Rawls College with the faculty and leadership of
Texas Tech. If nothing else it would have been free consulting.
Why wouldn't you take time to listen to the ideas of Dr.

EXHIBIT Y                          JW-000148

**Bobby G. Stevenson**        303-220-8999

5251 DTC Parkway
Suite 285
Greenwood Village, CO 80111

Wetherbe, one of the top ranked business consultants and
scholars?

I am sorry, but your claims to respect my and others (e.g.,
search committee and nominations) views and honor my
service for this search simply does not ring true. You not only
reject recommendations and nominations; but after waiting
two weeks you send a response that as evidenced above is
incomplete in addressing the issues or answering the
questions raised in my missive of April 30, 2012.

As stated before, your conduct has cost Texas Tech at least $9
million in future donations from a donor who made the largest
single contribution to the new business building and millions
of dollars for scholarship and an endowed chair. You have said
nothing to change my mind and in fact have only confirmed
my cancellation of the gift.

**ciber**®

This time I respectfully ask that you respond to each point
above numbered one through ten. Would you please respond
using the same numbering scheme so nothing is overlooked
and I can make an informed decision about an appropriate
next course of action.

Sincerely,

*B. Stevenson*

Bobby G. Stevenson
Founder
CIBER

cc  President Guy Bailey
     Chancellor Kent Hance

EXHIBIT Y                                           JW-000149

-----Original Message-----
From: Rivers, Randi <randi.rivers@ttu.edu>
To: jcwetherbe <jcwetherbe@aol.com>
Sent: Thu, Feb 2, 2012 2:01 pm
Subject: MEMO to the Rawls College of Business Faculty and Staff Regarding the Dean Search from Provc

**The following message is being sent on behalf of Provost Smith...**

**Date:**      **February 2, 2012**
**To:**        **The Rawls College of Business Faculty and Staff**
**From:**      **Bob Smith, Provost**
**Re:**        **Dean Search**


**Dear Colleagues,**

      I have been informed by different sources that rumors have emerged from the Rawls College i
conduct of the current search for a Rawls College Dean.  Specifically, we are hearing that the Rawls
and professionals outside of Texas Tech are being told that there is strong internal candidate or sin
candidate for the post and that additional internal or extramural candidates need not apply.  I wish t
record straight.

      The Rawls College Dean search is a totally open search and all qualified candidates are invite
apply.  The search will come to fruition in an open and honest fashion and <u>there is no inside track fi</u>

      If there are further questions about the search I encourage you to contact Dr. John Kobza (As
Whitacre College of Engineering) who is currently serving as Chair of the Rawls College Dean Sear
Committee.  He will confer with me as needed.  Thank you for your cooperation and thank you for h
spread the word about the authenticity of the Rawls College Business Dean search.

      **Kind regards,  Bob Smith.**

                                          JW-000116